**BURLINGTON NORTHERN RAILROAD COMPANY, Plaintiff,**

v.

**UNITED TRANSPORTATION UNION INTERNATIONAL; M.M. Winter, General Chairman; W.P. Torres, Local Chairman; R.J. Daurer, Local Chairman; American Train Dispatchers Association; Brotherhood of Locomotive Engineers; Brotherhood of Maintenance of Way Employees; Brotherhood of Railroad Signalmen; Brotherhood Railway Carmen (Division of TCU); Hotel and Restaurant Employees International Union; International Association of Machinists; International Brotherhood of Boilermakers and Blacksmiths; International Brotherhood of Electrical Workers; International Brotherhood of Firemen & Oilers; Railroad Yardmasters of America (Division of UTU); Sheet Metal Workers' International Association and Transportation Communications Union, Defendants.**

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Plaintiff,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY and Winona Bridge Railway Company, Defendants.**

Nos. 88 C 2687, 88 C 4528.

United States District Court, N.D. Illinois, E.D.

June 9, 1988.

Richard J. Schreiber/Thomas J. Knapp, Burlington Northern Railroad, Fort Worth, Tex., Kenneth J. Wysoglad/Michael L. Sazdanoff, Kenneth & Wysoglad & Assoc., Chicago, Ill., for plaintiffs.

John Naughton, Henslee Monek and Henslee, Chicago, Ill., Clinton J. Miller, Asst. General Counsel, United Transp. Union, Cleveland, Ohio, for defendants.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The Burlington Northern Railroad Company ("Burlington") entered into a trackage rights agreement with its wholly-owned subsidiary, the Winona Bridge Railway Company ("Winona"), whereby Winona is to operate Burlington trains over certain routes. The unions representing Burlington employees view the agreement as an unlawful attempt to unilaterally circumvent the provisions of various collective bargaining agreements. Burlington filed this action for a judgment declaring the legitimacy of the agreement and for an injunction to prevent the unions from striking because of the agreement. The unions counterclaimed to prevent Winona from operating trains under the agreement.

Currently before this Court are two motions for preliminary injunction. The unions move to enjoin implementation of the trackage rights agreement. Burlington

moves to enjoin a threatened strike. For the reasons set forth in this memorandum opinion, we grant the unions' motion and deny Burlington's motion.

### Factual Background and Procedural History

Burlington is a Class I railroad carrier subject to the jurisdiction of the Interstate Commerce Commission ("ICC") and the provisions of the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 10101–11917, and the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 et seq. (1926). The defendant-unions are the collective bargaining representatives for Burlington's employees within the meaning of the RLA. The United Transportation Union ("UTU") represents Burlington's conductors, brakemen and switchmen. The Brotherhood of Locomotive Engineers ("BLE") represents engineers. Under current union contracts, Burlington must maintain a crew consisting of an engineer, a conductor and one or two brakemen on any trains operating over its northern lines.

In an effort to reduce its operating costs to compete with other motor and rail carriers, Burlington sought renegotiation of the union contracts to eliminate one brakeman from all railroad crews and to begin operating "expediter trains" with crews of only one engineer and one conductor. Most of the unions' local committees acceded to Burlington's request as applied to Burlington lines running through various portions of the United States, including the Chicago–St. Paul and Chicago–Houston lines. However, Burlington was less successful with union local committees for lines running through the northern corridor of the continental United States. Specifically, in negotiation sessions through July and August of 1987, the UTU refused to grant Burlington the crew consist and expediter train concessions for trains operating between and within the states of Wisconsin and Washington.

After its unsuccessful attempts to renegotiate the union contracts at the bargaining table, Burlington tried another approach. On November 16, 1987, Burlington entered into the trackage rights agreement with Winona. Throughout all periods relevant to this action, Winona's assets consisted of an out-of-service bridge, accompanying operating equipment and 1.07 miles of railroad track. Winona employed five individuals, none of whom ever actually operated trains over the distances contemplated by the agreement. By the terms of the trackage rights agreement, Burlington granted Winona the right to operate Burlington trains over the 1,860 miles of track between Winona Junction, Minnesota, and Seattle, Washington, and pick up and set out traffic in three cities. Burlington agreed to provide any needed equipment.

After the agreement was signed, Winona asked UTU and BLE to begin to negotiate a collective bargaining agreement for personnel operating trains under the trackage rights agreement. The UTU considered the Winona–Burlington agreement an unabashed attempt by Burlington to avoid its obligations under current union contracts and accordingly served notice pursuant to Section 6 of the RLA, 45 U.S.C. § 156, that the agreement constituted a unilateral change in working rules and conditions and was subject to mandatory bargaining before Burlington could initiate operations pursuant to the agreement.

Burlington refused to submit to the dispute resolution mechanisms of the RLA, contending that an ICC exemption relieved it of any duties under the RLA. Burlington and Winona filed with the ICC a request for an exemption under 49 U.S.C. § 10505(a)[1] and its implementing regula-

---

1. Section 10505(a) provides:

§ 10505. Authority to exempt rail carrier transportation

(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—

(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a

tion, 49 C.F.R. § 1180.2(d)(7).[2] As is standard procedure, the ICC automatically granted the exemption on November 25, 1987, with the accompanying mandatory labor protective conditions of *Mendocino Coast Railway Company—Lease and Operate,* 354 I.C.C. 732 (1978), 360 I.C.C. 653 (1980), *aff'd sub nom. Railway Labor Executives' Asso. v. United States,* 675 F.2d 1248 (D.C.Cir.1982).[3] The unions challenged the validity of the exemption by filing pursuant to § 10505(d) petitions to stay, reject and revoke the exemption. The ICC has yet to rule on the unions' petitions to revoke.[4]

Burlington notified all of its employees by letter of the Winona transaction and its intentions to commence operations under the agreement by early April 1988. Burlington acknowledged in the letter that it entered into the trackage rights agreement with Winona only because the local committees of the UTU refused to yield in negotiations to Burlington's crew consist and expediter train demands:

> WBRR [Winona] is BN's [Burlington's] *second choice.* BN would have preferred to have successfully negotiated with the UTU Northern Line committees to make BN more competitive. Because representatives of these committees have been unwilling to negotiate the necessary agreement, WBRR will begin operations

as soon as it can obtain union representation and finalize customer contracts.

The unions threatened to strike if Burlington began operating trains under the trackage rights agreement. On March 29, 1988, Burlington filed this action against the unions, union associations and various union officers seeking a declaratory judgment that implementation of the trackage rights transaction does not violate the RLA and an injunction enjoining the unions from in any way interfering with the transaction. The unions counterclaimed, charging Burlington with violations of the RLA and seeking appropriate declaratory and injunctive relief. Defendant-counterplaintiff UTU moves for a preliminary injunction enjoining implementation of the trackage rights agreement.[5] Burlington also moves to enjoin the threatened strike. Burlington and Winona have represented to this Court that they will delay initiating operations under the trackage rights agreement until June 10, 1988.

### The Motions for Preliminary Injunction

We are guided by the following standards in deciding the parties' respective motions for preliminary injunction. To obtain injunctive relief prior to final judgment in a lawsuit, the plaintiff must demonstrate

---

provision of this subtitle is not needed to protect shippers from the abuse of market power.

2. Section 1180.2(d)(7) provides:

§ 1180.2. Types of transactions

\* \* \* \* \* \*

(d) A transaction is exempt if it is within one of the seven categories described below

...

\* \* \* \* \* \*

(7) Acquisition of trackage rights and renewal of trackage rights by a rail carrier over lines owned or operated by any other rail carrier or carriers that are: (i) based on written agreements, and (ii) not filed or sought in responsive applications in rail consolidation proceedings.

3. Included among the *Mendocino Coast* conditions are guarantees of a displacement allowance, moving expenses and up to six years of wages to current Burlington employees dismissed as a direct result of the transaction.

4. In a January 7, 1988 order, the ICC denied the petitions to reject, finding irrelevant Burlington's motivation in filing for an exemption. Two of the five commissioners would have rejected the petition on the grounds that Winona may very well not be "another carrier" within the meaning of 49 C.F.R. § 1180.2(d)(7). On March 7, 1988, the ICC denied UTU's petition to stay. The Eighth Circuit dismissed UTU's subsequent appeal on the grounds that the Court lacked jurisdiction without a final order from the ICC, apparently on the petitions to revoke. The Eighth Circuit has yet to issue its opinion.

5. BLE filed a separate action against Burlington and Winona in the Eastern District of Washington and similarly moved to enjoin implementation of the trackage rights agreement. On May 20, 1988, United States District Court Judge Robert J. McNichols transferred the case to this Court, and we have appropriately ordered that the two actions be treated as related cases. Our decision here applies equally to BLE's motion for preliminary injunction.

a reasonable likelihood of success on the merits of the case, that the harm the plaintiff will suffer without the injunction outweighs the harm that the injunction will inflict on the defendant and that granting the injunction will not disserve the public interest. *On/TV of Chicago v. Julien,* 763 F.2d 839, 842 (7th Cir.1985). The stronger the plaintiff's case is on the merits, the less heavily need the balance of harms weigh in the plaintiff's favor. *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 387 (7th Cir.1984); *Miss Universe, Inc. v. Flesher,* 605 F.2d 1130, 1134 (9th Cir. 1979); *American Airlines, Inc. v. A 1–800–A–M–E–R–I–C–A–N Corp.,* 622 F.Supp. 673, 681 (N.D.Ill.1985).

In support of its motion, the UTU contends that implementation of the trackage rights agreement creates a "major dispute" between Burlington and the unions, and Burlington is therefore required under the RLA to stay railroad operations under the agreement until the parties exhaust the mandatory bargaining procedures of the RLA. Burlington contends that the parties are embroiled in, at most, a "minor dispute" and, accordingly, Burlington may implement the agreement while the parties submit their dispute to binding arbitration. Further, Burlington argues, the ICC exemption relieves Burlington of any attendant obligations under the RLA, and the unions may not collaterally attack an ICC exemption in court under the guise of the RLA. In any event, Burlington concludes, the unions have not demonstrated that they would suffer irreparable injury prior to final judgment if Winona begins operating trains.

We first address the parties' respective positions as to the duties that the RLA imposes in this dispute and conclude that Burlington cannot operate trains under the trackage rights agreement until it has completed the dispute resolution mechanisms set forth in Sections 5 and 6 of the RLA, 45 U.S.C. §§ 155, 156. We next address the implications of the ICA and conclude that an ICC exemption of a trackage rights agreement between a carrier and a wholly-owned financially-dependent subsidiary involving substantial lengths of track does not relieve the carrier of its duties under the RLA regardless of the imposition of accompanying labor protective condition.

### *The Unions' Likelihood of Success Under the Railway Labor Act*

In an effort to end the recurrent work stoppages in rail commerce that accompanied virtually any dispute between labor and management, Congress passed the RLA compelling the parties "to settle all disputes ... in order to avoid any interruption to commerce or to the operation of any rail carrier," 45 U.S.C. § 152, First, by resorting to certain specified dispute resolution mechanisms. The RLA sets forth two separate sets of settlement procedures, and the nature of the dispute—major or minor—determines the procedures that the parties must follow:

> [A major dispute] relates to ... the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past. [A minor dispute, or "grievance"] however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one.

45 U.S.C. § 151a(4), (5); *Elgin, J & E Railway Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). *See also Chicago & Northwestern Transp. Co. v. United Transp. Union,* 656 F.2d 274 (7th Cir.1981).

If labor and management are involved in a minor dispute, they must submit to binding arbitration under the auspices of the National Railroad Adjustment Board or a special adjustment board. 45 U.S.C. § 153, First and Second. Pending the arbitration board's decision, the railroad may "continue to apply its interpretation of the agreement" and go ahead with its planned change in operations. *National Railway*

*Labor Conference v. International Asso. of Machinists*, 830 F.2d 741, 749 (7th Cir. 1987). The union may not, however, strike while the dispute is in arbitration or after the arbitration board renders its judgment. Accordingly, a district court can enjoin a strike arising from a minor dispute. *Brotherhood of R.R. Trainmen v. Chicago River and Indiana R.R. Co.*, 353 U.S. 30, 41–42, 77 S.Ct. 635, 640–41, 1 L.Ed.2d 622 (1957); *Atchison, Topeka & Santa Fe Ry. Co. v. United Transp. Union*, 734 F.2d 317, 320 (7th Cir.1984).

If, on the other hand, labor and management are embroiled in a major dispute, the parties must participate in good faith in a specified series of nonbinding settlement procedures, including negotiation and conference, mediation under the auspices of the National Mediation Board and acceptance or rejection of binding arbitration, as well as cooling-off periods. 45 U.S.C. §§ 155, 156; *Elgin v. Burley*, 325 U.S. at 725, 65 S.Ct. at 1290–91. Throughout these proceedings, a status quo prevails. 45 U.S.C. §§ 155, 156, 160. Thus, unlike a minor dispute, the carrier cannot unilaterally implement its plans but must "preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Detroit & Toledo S.L.R. Co. v. United Transp. Union*, 396 U.S. 142, 152–53, 90 S.Ct. 294, 300–301, 24 L.Ed.2d 325 (1969). Only after all of the settlement procedures have been exhausted may the carrier implement its plan or the union organize a work stoppage.

We have no difficulty concluding that the dispute here between the UTU and Burlington regarding working conditions on trains operated pursuant to the trackage rights agreement is a major dispute subject to the mandatory bargaining and status quo provisions of the RLA. As Burlington made clear in the letter to its employees, the trackage rights agreement is an attempt to operate trains with crews smaller than those mandated by union contract. The parties do not dispute the exist-

ence or interpretation of the pertinent terms of current collective bargaining agreements. Rather, Burlington seeks to alter the terms of the collective agreement as applied to operations by Winona pursuant to the trackage rights agreement.

That Winona and not Burlington, its parent corporation, will operate the trains is of no consequence to our decision. As numerous courts have made clear, a carrier cannot evade its duties under a union contract and the RLA by diverting business currently subject to the contract to an entity within the corporate family that is not covered by the collective bargaining agreement. *International Asso. of Machinists and Aerospace Workers v. Eastern Airlines, Inc.*, No. 87–1720, 127 L.R.R.M. 3078, 1988 U.S.Dist. LEXIS 3335 (D.D.C. March 10, 1988) [available on WESTLAW, 1988 WL 25506], *vacated and remanded on other grounds*, 849 F.2d 1481 (D.C.Cir.1988) (*"Eastern Airlines"*); *Butte, Anaconda & Pacific Ry. Co. v. Brotherhood of Locomotive Firemen and Enginemen*, 268 F.2d 54 (9th Cir.), *cert. denied*, 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959) (*"Butte"*). The transfer of assets and personnel to a wholly-owned subsidiary in order to circumvent obligations to employees arising out of a union contract violates the status quo provisions of the RLA, and a district court may enjoin such transfer. *Eastern Airlines*, at 1485.

In *Butte*, the Ninth Circuit was faced with a railway dispute very similar to the dispute here between UTU and Burlington. Butte–Anaconda, the rail carrier, sought to operate a new switching yard with crews smaller than required under an existing union contract. Failing to successfully negotiate the reduced crews with the union, Butte–Anaconda arranged for Anaconda, its parent corporation, to take over the switching yard and thereby remove the yard from the reach of the union contract. The Ninth Circuit held that a carrier cannot evade the mandatory bargaining and status quo provisions of the RLA by redirecting work through any kind of arrangement to a corporate entity that shares "common principal officers and the unified purpose of serving the ultimate best interests" of

the corporate parent. 268 F.2d at 59. Here, Burlington, the carrier, was unsuccessful in modifying the union contract as to crew size through negotiation and now seeks to evade its contractual duties by selling trackage rights to a wholly-owned subsidiary that is financially dependent upon and beholden to the carrier. As *Butte* makes clear, exhaustion of the settlement procedures of the RLA must precede the implementation of such an arrangement.

Burlington seeks to distinguish these cases by pointing out that it will not transfer to Winona any business currently handled by Burlington employees. Specifically, the trackage rights agreement allows Winona to operate trains only to service new business which Burlington could never have obtained on lines subject to current union contracts. We are unconvinced by this argument. First, the trackage rights agreement itself contemplates possible transfers of business in the future. Further, the agreement does not preclude "swap arrangements" whereby Burlington sells current business to a third carrier in return for "new business" that may be directed to Winona. The mere prospect of having work shifted to a replacement subsidiary is a change in working conditions and practices subject to the status quo and mandatory bargaining provisions of the RLA. *Airline Pilots Asso., International v. Transamerica Airlines, Inc.*, 817 F.2d 510 (9th Cir.1987). In any event, the work to be performed by employees operating Winona trains is identical to that performed by current Burlington employees. "The deprivation of a work opportunity involving the type of work traditionally performed by the Union is a change in working conditions, even where the work is new." *Transport Workers Union v. Eastern Air Lines, Inc.*, 544 F.Supp. 1315, 1327 (E.D.N.Y.), *aff'd and modified*, 695 F.2d 668 (2d Cir.1982). *See also St. Louis S.W. Ry. Co. v. Brotherhood of Signalmen*, 665 F.2d 987, 993 (10th Cir.1981), *cert. denied*, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982) (finding a major dispute when a carrier allowed non-union employees to perform work previously performed by bar-

gaining unit employees). Allowing a carrier to evade its union contract on the assertion that the non-union work is merely business that the carrier never could have obtained with the contract provides an easy avenue to evade any union contract.

Finally, Burlington attempts to characterize this dispute as a minor dispute with evidence that the unions never opposed past trackage rights agreements and always found ICC-imposed employee protective conditions satisfactory. It is well established that a dispute over a practice of the carrier is a minor dispute if the carrier performed similarly in the past with the union's knowledge and acquiescence. *Detroit and Toledo Shoreline R.R.*, 396 U.S. at 153–54, 90 S.Ct. at 301; *National Railway Labor Conference*, 830 F.2d at 747; *Main Central R.R. Co. v. United Transp. Union*, 787 F.2d 780 (1st Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986). In effect, the past practice constitutes an implied-in-fact contract between management and labor, and any dispute over the practice amounts to a dispute over the interpretation of a contract. This principle is inapplicable here, however, because Burlington's past trackage rights agreements differed significantly from the Burlington–Winona agreement: the past agreements did not grant rights to a wholly-owned financially-dependent subsidiary over relatively great lengths of trackage. Burlington has presented no evidence that the unions acquiesced in any trackage rights agreements such as its agreement with Winona that constituted a real threat to the viability of the unions' collective bargaining agreements and essentially amounted to a blatant attempt to force union concessions unobtainable at the bargaining table.

Therefore, the UTU has demonstrated that its dispute with Burlington over working conditions on trains operated by Winona under the trackage rights agreement is a major dispute subject to the mandatory bargaining and status quo provisions of the RLA. We may enjoin Burlington from any threatened actions that would constitute a change in the status quo pending comple-

tion of the settlement procedures of the RLA.[6] *Chicago & Northwestern Ry. Co. v. United Transp. Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); *United Transp. Union v. Burlington Northern, Inc.,* 458 F.2d at 357. Burlington has stated that it plans to commence operations under the trackage rights agreement on June 10, 1988, in the event that this Court does not issue an injunction. This would constitute a change in the status quo and, accordingly, a preliminary injunction is warranted.

### Implications of the ICC Exemption

The ICC must approve any agreement by which a rail carrier acquires trackage rights over another rail carrier's lines. 49 U.S.C. § 11343(a)(6).[7] Labor protective conditions must accompany any such approval. § 11347. After the receipt of ICC approval, the carriers may go forward with the transaction free from the strictures of the antitrust laws and "all other law, including State and municipal law." § 11341(a). Thus, ICC approval under § 11343 (or an exemption pursuant to § 11343(e)(1) from such approval "in a matter related to a motor carrier") relieves the carriers of any obligations that the RLA would otherwise impose with respect to the transaction. Further, the unions may not strike to block implementation of an ICC-approved trackage rights agreement. *See, e.g., Missouri Pacific R.R. Co. v. United Transp. Union,* 782 F.2d 107 (8th Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3209, 96 L.Ed.2d 696 (1987).

The ICA additionally provides in § 10505 that the ICC may exempt from the approval requirements of § 11343 any rail transaction, including trackage rights agreements, that it determines:

(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not necessary to protect shippers from the abuse of market power.

49 U.S.C. § 10505(a); *Illinois Commerce Comm. v. Interstate Commerce Comm.,* 819 F.2d 311 (D.C.Cir.1987). As with approved transactions, labor protective conditions must accompany any § 10505 exemption. 49 U.S.C. § 10505(g)(2); *McGinness v. Interstate Commerce Comm.,* 662 F.2d 853 (D.C.Cir.1981). However, unlike transactions subject to ICC approval under § 11343, Congress did not expressly provide that a § 10505 exemption relieves the involved carriers of any attendant statutory duties, such as their obligations under the RLA. *Railway Labor Executives' Asso. v. Pittsburgh & L.E. Ry. Co.,* 677 F.Supp. 830, 833 (W.D.Pa.1987), *aff'd,* 845 F.2d 420 (3d Cir.1988); *Burlington, Inc.— Control Exemption,* I.C.C. Decision No. MD–F–16248, slip op. at 6 (February 13, 1986); Ex Parte No. 282 (Sub–No. 9), *Railroad Consolidation Procedures—Trackage Rights Exemption,* 1 I.C.C.2d 270, 279 (1985).

A number of courts have, however, found various federal labor statutes preempted by implication, holding that the

---

**6.** Once the plaintiff has established the existence of a major dispute and a threatened change in the status quo, we may issue the preliminary injunction without finding that the plaintiff may suffer irreparable injury without an injunction, for such injury is ordinarily presumed. United Transp. Union v. Burlington Northern, Inc., 458 F.2d 354, 357 (8th Cir.1972); Southern Ry. Co. v. Brotherhood of Locomotive Firemen and Enginemen, 337 F.2d 127, 133–34 (D.C.Cir.1964). We find nevertheless that the union has demonstrated irreparable injury with evidence that Burlington employees would lose seniority rights during the pendency of this action if Winona operates Burlington trains with non-union personnel.

**7.** Section 11343(a)(6) provides:
§ 11343. Consolidation, merger, and acquisition of control
(a) The following transactions involving carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I (except a pipeline carrier), II, or III of chapter 105 of this title may be carried out only with the approval and authorization of the Commission:

* * * * * *

(6) acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier.

RLA and the Norris–La Guardia Act must in certain situations yield to labor protective conditions accompanying any approval or § 10505 exemption not subject to the express preemptions of § 11341. For example, the Eighth Circuit has held that preemption of the RLA and Norris–La Guardia Act may accompany the exemption of a § 10901 purchase by non-carriers in the event that the ICC imposes labor protective conditions. *Burlington Northern, Inc. v. United Transp. Union,* 848 F.2d 856 (8th Cir. 1988); *Railway Labor Executives' Asso. v. Chicago & Northwestern Transp. Co.,* 848 F.2d 102 (8th Cir.1988). Accordingly, the carriers may proceed with the transaction without exhausting the mandatory bargaining procedures of the RLA. The Eighth Circuit reasoned that mandatory bargaining would so delay the transaction as to undermine the ICC's efforts to encourage the efficient use of new and abandoned railroad lines in furtherance of the national transportation policy of the ICA. *Compare Railway Labor Executives' Asso. v. Pittsburgh & L.E.R.R. Co.,* 845 F.2d 420 (3d Cir.1988) (holding that exemption of a § 10901 sale does not preempt the RLA in the absence of labor protective conditions without suggesting whether preemption attaches if the ICC does impose labor protective conditions).

Courts have similarly applied this judicially-constructed preemption to trackage rights agreements and other consolidations, mergers and acquisitions exempted under § 10505. In *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.,* 788 F.2d 794 (1st Cir.), *cert. denied,* 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986), the First Circuit held that compliance with the labor protective conditions accompanying an exemption of a trackage lease relieves carriers of their obligations under the status quo and mandatory bargaining provisions of the RLA. The Court appeared to base its decision in part on the unchallenged assumption that exemptions under § 10505 of § 11343 transactions are automatically subject to the express preemptive language of § 11341. *See also Railway Labor Executives' Asso. v. Guil-*

*ford Transp. Industries, Inc.,* 667 F.Supp. 29 (D.Me.1987).

An important theme underlying all of these decisions is the need to defer to the ICC's role of reconciling the potentially conflicting provisions of the various union contracts that may cover the transaction. The courts recognize the potential crippling disorder that would accompany disputes between and among the numerous unions and railroad companies involved in a transaction. We are faced here with a situation as yet unaddressed by any other court and one not subject to such potential disruption —a carrier attempting to relieve itself of its duties under a collective bargaining agreement by transferring substantial trackage rights to a wholly-owned financially-dependent subsidiary. Such agreements, if allowed to progress without the labor protections of the RLA, could be used by a carrier to systematically nullify its collective bargaining agreements while reaping the financial benefits from train operations no longer subject to the union contract. We must accordingly carefully examine the policies behind the RLA and the pertinent ICA provisions to determine whether in this situation the statutes are in irreconcilable conflict and an overriding policy served by the ICA mandates that the RLA give way. *Railway Labor Executives' Asso. v. Pittsburgh & L.E.R.R. Co.,* 831 F.2d 1231, 1234 (3d Cir.1987).

The RLA is a labor statute that has been in effect, substantially unmodified, since 1926 and represents Congress' attempt to prevent the crippling work stoppages that plagued the railroad industry by forcing the parties to resolve their disputes through mandatory bargaining instead of the traditional forms of self-help. Through its sixty years of existence, the dispute resolution mechanisms of the RLA have become a bedrock of railway management-labor relations. Indeed, in apparent recognition of the RLA's success in bringing some calm to the railway industry, Congress has expressed no intention to repeal the RLA or modify any of its provisions.

The ICA, enacted in 1887, is fundamentally a commerce statute through which the

federal government regulates interstate transportation. In an effort to promote competition and reasonable rates in rail transportation and relieve the railroad industry of some of the regulatory burdens of the ICA, Congress enacted the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31 ("4–R Act"), and the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895. 49 U.S.C. §§ 10101 *et seq.* The 4–R Act empowered the ICC to exempt transactions or classes of transactions from administrative approval requirements. The Staggers Act expanded this power in the context of rail transactions. The approval and exemption provisions at issue in this case fall within the Staggers Rail Act modifications to the ICA.

Two aspects of the ICA, as modified by the Staggers Act, are important to our analysis here. First, the ICA is not a labor statute, and Congress manifested no intent otherwise. Congress expressly identified the policies that it intended the Staggers Act to promote. Only one of these policies addresses the interests of the railroad industry employees:

> In regulating the railroad industry, it is the policy of the United States Government—
>
> *   *   *   *   *   *
>
> (12) to encourage fair wages and safe and suitable working conditions in the railroad industry;

49 U.S.C. § 10101a. Second, transactions exempted from administrative approval are by definition transactions that do not impact the transportation policy of the ICA. The ICC exempts a transaction such as a trackage rights agreement only if the ICC finds that the transaction "is not necessary to carry out the transportation policy" of the Staggers Act. 49 U.S.C. § 10505(a)(1). Thus, in any direct or indirect conflict between an exemption pursuant to § 10505 and a fundamental time-honored federal labor policy, the former must yield.

With these considerations in mind, we conclude that the labor protective conditions accompanying the exemption of a trackage rights agreement between a carrier and its wholly-owned financially-dependent subsidiary implicating substantial rail traffic do not relieve the carrier of its attendant obligations under the RLA. In those decisions in which the courts held that ICC-imposed labor protective conditions superseded the RLA, the courts were not faced with a carrier making an agreement essentially with itself and then, through the good offices of the ICC, circumventing the mandatory bargaining procedures of the RLA in order to operate trains over substantial portions of its tracks without abiding by the terms of its union contracts. Here, there is a very real danger that a carrier could, whenever it is unable to renegotiate its labor contracts to its satisfaction, force the unions to accede to its demands by shifting business (or funnelling new business) to a subsidiary in clear violation of the RLA, and then resorting to ICC exemption procedures to strip the unions of their protections under the RLA.

■ By the very terms of the Staggers Act, the benefits to the transportation policy of the ICA that accompany the exemption are minimal. Indeed, the benefits would accrue, for the most part, to Burlington in the form of unions in a much weaker bargaining position by virtue of the inapplicability of the RLA. The potential harm to the RLA and the whole concept of collective bargaining agreements is, in the context of this case, significant. There is no evidence that Congress intended that the important *but limited* aim of the ICC in assuring fair wages and working conditions as it promotes railway commerce would undermine the foundation of a federal labor statute that has stood the test of time, virtually untouched. The potential harm to the basic policies of the RLA far outweigh any benefits to commerce that might accompany an exempted trackage rights agreement between a carrier and its wholly-owned subsidiary involving significant rail traffic. Accordingly the carrier is not relieved of its obligations under the RLA.

We are unpersuaded by Burlington's insistence that the administrative processes

of the ICC and, ultimately, the labor protective conditions accompanying an exemption, assure that labor's interests are respected and preserved and therefore render the RLA unnecessary. In exemption proceedings before the ICC, the unions are, at most, a "small voice of protest" and labor's concerns are only one of fifteen[8] co-equal policies that the ICC must balance. *Railway Labor Executives' Asso.*, 831 F.2d at 1237, *quoting Texas and New Orleans R.R. Co. v. Brotherhood of R.R. Trainmen*, 307 F.2d 151, 158 (5th Cir.1962), *cert. denied*, 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed. 2d 500 (1963). The mandatory bargaining provisions of the RLA contemplate that labor and management will negotiate on an equal footing in disputes affecting the boundaries of labor's basic rights and duties in the employment relationship. Nowhere did Congress express an intent to force the unions to rely on their limited position at the ICC to uphold their collective bargaining agreements when a carrier seeks to alter the terms of the agreements by directing substantial business otherwise handled by union members to a non-union subsidiary.

We are not unmindful that Burlington sees a genuine business opportunity in putting its excess trackage capacity on the northern lines to work in competition with other transportation modes and carriers. Burlington views current union contracts as impediments to such goals. The proper and lawful avenue for Burlington is to continue negotiations with the unions within the framework of the RLA, as it has done with the local committees in other portions of the United States, rather than directing business to a subsidiary whose profits will directly or indirectly accrue to Burlington

and then rely on the ICC to dilute the unions' bargaining power.[9]

### Conclusion

Notwithstanding the ICC exemption, Burlington Northern may not initiate operations under its trackage rights agreement with Winona Bridge until it has exhausted the mandatory bargaining provisions of the Railway Labor Act. Accordingly, the United Transportation Union's and the Brotherhood of Locomotive Engineer's motions for preliminary injunction to enjoin the trackage rights agreement are granted, and the Burlington Northern's motion to enjoin a threatened strike is denied.[10]

For the reasons set forth in this opinion, it is ordered that, until final judgment is entered in this action, plaintiff-counterdefendants Burlington Northern Railroad Company and Winona Bridge Railway Company, their officers, agents, servants, representatives, employees and persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise:

(1) are enjoined and restrained from unilaterally changing the rates of pay, rules and working conditions of employees represented by the United Transportation Union and Brotherhood of Locomotive Engineers until such time as Burlington initiates and exhausts the procedures set forth in the Railway Labor Act for changing such matters; and otherwise violating their obligations under the Railway Labor Act; and

(2) shall maintain the status quo as it existed prior to the inception of the present dispute by not commencing

**8.** These policies are listed at 49 U.S.C. § 10101a.

**9.** Our decision in no way addresses the validity of the ICC exemption. The unions' challenge to the exemption itself is properly before the ICC in revocation proceedings, § 10505(d), and may ultimately be addressed by the Eighth Circuit pursuant to 28 U.S.C. §§ 2321 and 2342(5). *Interstate Commerce Comm. v. Brotherhood of Locomotive Engineers*, — U.S. —, 107 S.Ct. 2360, 2365, 96 L.Ed.2d 222 (1987). We merely hold that a carrier cannot commence rail traffic under an exempted transaction that grants sub-

stantial trackage rights to a wholly-owned financially-dependent subsidiary until it reaches some accommodation with its unions through the mandatory bargaining procedures of the RLA.

**10.** Burlington Northern has presented evidence that the unions threatened to strike when the carrier implements the trackage rights agreement. There is no evidence that the unions will strike in the event that we enjoin implementation.

operations pursuant to the trackage rights agreement entered into by Burlington and Winona on November 16, 1987, until such time as Burlington initiates and exhausts the dispute resolution procedures set forth in the Railway Labor Act; and

(3) shall exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions in accordance with Section 2, First, of the Railway Labor Act, 45 U.S.C. § 152, First, and otherwise comply with the requirements of the Railway Labor Act.[11]

---

**11.** The unions are to submit within three days a brief setting forth a proposed security pursuant to Fed.R.Civ.P. 65(c). Burlington Northern and Winona Bridge are to respond, if necessary, two days thereafter.