**BURLINGTON NORTHERN RAILROAD COMPANY, Plaintiff–Appellant,**

v.

**UNITED TRANSPORTATION UNION, et al., Defendants–Appellees.**

**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Plaintiff–Appellee,**

v.

**WINONA BRIDGE RAILWAY COMPANY, Defendant–Appellant.**

Nos. 88–2180, 88–2181.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1988.

Decided Nov. 18, 1988.

**1268**

Richard J. Schreiber, Steptoe & Johnson, Chicago, Ill., for plaintiff-appellant.

Clinton J. Miller, III, Asst. Gen. Counsel, United Transp. Union, Harold A. Ross, Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, for defendants-appellees.

Before CUMMINGS and EASTERBROOK, Circuit Judges, and GRANT, Senior District Judge.*

CUMMINGS, Circuit Judge.

Appellant Burlington Northern Railroad Company ("Burlington") appeals from the district court's order of June 9, 1988, granting appellees United Transportation Union ("UTU") and Brotherhood of Locomotive Engineers ("BLE") a preliminary injunction enjoining a proposed trackage rights agreement between Burlington and its wholly owned subsidiary, Winona Bridge Railway Company ("Winona Bridge"), pending resolution of a major dispute under the Railway Labor Act, and denying a preliminary injunction enjoining the Unions from striking as well as declaratory judgment relief. We have jurisdiction over this matter pursuant to 28 U.S.C. § 1292(a)(1).

## I. FACTS AND PROCEDURAL HISTORY

Burlington Northern is a Class I railroad subject to the jurisdiction of the Interstate Commerce Commission ("ICC") and the provisions of the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 10101–11917, and the

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

Railway Labor Act, 45 U.S.C. §§ 151–163 ("RLA"). Its railroad system stretches throughout the western, midwestern and southeastern portions of the United States.

At all times relevant to this action, Burlington's crews were represented by the United Transportation Union, apart from the engineers who were represented by the Brotherhood of Locomotive Engineers. The collective bargaining agreements in effect at all times called for crews consisting of one engineer, one conductor and one or two brakemen.

In early 1980, Burlington, in an effort to compete with the lower-priced motor carrier industry, designed its Expediter Service system. The Expediter Service consisted of a locomotive and trailers-on-flatcars which could be operated by a crew of two, an engineer and a brakeman. Burlington believed the lower-priced Expediter Service would compete with motor carriers and attract business as yet unavailable to Burlington due to the higher costs associated with the existing rail transport systems.

Burlington undertook negotiations with local committees of UTU in an effort to implement the Expediter Service. Most of the local committees of UTU accepted the change in crew consist for the Expediter Service in exchange for special allowances and productivity gain-sharing. As a result, the Expediter Service is currently in operation on approximately two-thirds of Burlington's rail system.

Burlington has not been successful, however, in its negotiations with the local committees of UTU comprising its Northern Line, which stretches from St. Paul, Minnesota, to Seattle, Washington. The local committees of the Northern Line have refused to agree to the new crew consists involved in the Expediter Service.

■ Burlington, undaunted by its setback at the bargaining table, devised another means of accomplishing implementation of its Expediter Service on its Northern Line, one that avoids the necessity of union negotiations. Burlington granted its wholly owned subsidiary, Winona Bridge, trackage rights over the Northern Line. A trackage rights agreement essentially grants rights to a carrier to operate trains over the grantor's track. Such an agreement may limit the use of the track by withholding permission to serve customers along the track, limiting service to specified points on the track or granting unimpaired rights to service points on the track. See *Illinois Commerce Comm'n v. Interstate Commerce Comm'n*, 819 F.2d 311, 312 (D.C.Cir.1987). The Burlington–Winona Bridge trackage rights agreement ostensibly limited Winona Bridge's right to pick up and set out traffic to Burlington's trailers-on-flatcars hub centers in St. Paul, Spokane and Seattle. The trackage rights agreement could be modified, however, to include other such points as Burlington might authorize in writing. As a consequence, the only impediment to Winona Bridge's unfettered right to use the track as Burlington now does is written permission. The trackage rights agreement covers approximately 1,860 miles of track from Winona Junction, Wisconsin, to Seattle, Washington. The agreement calls for Burlington to supply the trains and all necessary equipment.

At the time of the trackage rights agreement and up to the present, Winona Bridge's assets consisted of an out of service bridge, accompanying operating equipment and 1.07 miles of track. Winona Bridge has five employees, none of whom had ever actually operated trains over the distance contemplated by the trackage rights agreement. Under the proposed plan Winona Bridge, which purportedly is not subject to the collective bargaining agreements with UTU and BLE, would be employing newly hired Expediter Service crews.

As required by statute, Winona Bridge sought ICC authorization to implement the trackage rights agreement. The trackage rights agreement fell within the reach of the ICC's expedited procedure for receiving approval of certain rail transactions. An applicant filing a notice of exemption under 49 U.S.C. §§ 10505 and 11343 is essentially granted an automatic exemption from the typical ICC filing and hearing procedures; the exemption is routinely granted upon a

filing received seven days in advance of the proposed transaction. See 49 C.F.R. §§ 1180.2(d)(7) and 1180.4(g)(2).

In response, the Unions filed a petition to reject exemption as well as a petition to revoke exemption. The ICC denied the petition to reject exemption, finding no reason to void on its face the notice of exemption and declining to consider the underlying motivations behind the proposed transaction.[1] Insofar as we have been advised, the ICC has yet to decide the petition for revocation.

After unsuccessfully moving for reconsideration by the ICC, UTU appealed to the Court of Appeals for the Eighth Circuit, which dismissed the appeal for want of a final order since the petition for revocation was still pending. *Winter v. Interstate Commerce Comm'n*, 851 F.2d 1056 (8th Cir.1988).

During this same time period, in December 1987 UTU and BLE each served notice on Burlington as provided by Section 6 of the Railway Labor Act ("RLA"), 45 U.S.C. § 156, insisting that the trackage rights agreement with Winona Bridge constituted a unilateral change in the collective bargaining agreements with Burlington. Burlington argued that Winona Bridge's operations would not affect the working conditions of Burlington employees, and that in any event the ICC authorization relieved Burlington of any RLA-imposed responsibilities. Both disputes were submitted to the National Mediation Board,[2] where they are still pending.

Burlington then filed this action on March 29, 1988, seeking injunctive relief against a threatened strike by the Unions, as well as declaratory relief that (1) RLA provisions antagonistic to the ICA as amended are superseded, and (2) bargaining was not required because the collective bargaining agreements implicitly authorized trackage rights agreements subject to mandatory labor protective conditions prescribed by the ICC. The Unions responded with a counterclaim seeking injunctive relief against unilateral changes in working conditions by the carriers as expected following implementation of the trackage rights agreement.[3] The Unions contend that despite the labor protective conditions for present Burlington employees imposed by the ICC, the collective bargaining agreement now in effect with Burlington should also apply to the new Winona Bridge operations. This would preclude Winona Bridge from negotiating an entirely new collective bargaining agreement governing, among other things, crew consists, job opportunities and future benefits, all of which, the Unions argue, could adversely affect Burlington employees. At the extreme, the Unions fear a complete diversion of business from Burlington to Winona after the expiration of the labor protective conditions, which terminate six years following implementation of the trackage rights agreement.

The district court denied the relief requested by Burlington and granted a preliminary injunction in favor of the Unions enjoining Burlington and Winona Bridge

---

1. In a January 7, 1988, order, F.D. No. 31163, the ICC denied the Unions' request for rejection of the exemption. The ICC determined at that early stage of the proceedings there was nothing in the notice of exemption to suggest a procedural infirmity and noted that the revocation hearing, which has yet to occur, will provide a forum for the merits of the claims. Two of the five commissioners would have rejected the notice of exemption on the ground that Winona Bridge may not be "another carrier" within the meaning of 49 C.F.R. § 1180.2(d)(7). See *id.* (Vice Chairman Lamboley and Commissioner Simmons, dissenting). The ICC denied the Unions' petition for a stay on March 7, 1988.

2. Burlington submitted the dispute with UTU to the National Mediation Board on April 7, 1988.

BLE submitted its dispute on that same date. Pending our decision, there has been no progress before that Board.

3. BLE originally filed a separate action against Burlington and Winona Bridge in the Eastern District of Washington, where it also moved for a preliminary injunction enjoining implementation of the trackage rights agreement on May 20, 1988. The district court, McNichols, J., transferred the case to the Northern District of Illinois, where Judge Aspen appropriately ordered the actions consolidated. For the sake of simplicity, we will refer to UTU and BLE collectively as the Unions. Since the actions seek the same relief and are premised on identical grounds, our decision is dispositive of both.

from implementing the trackage rights agreement and changing working conditions of employees represented by these Unions until Burlington exhausts the dispute resolution mechanisms set forth in the RLA. On appeals from orders granting or denying preliminary injunctions, we review questions of law *de novo* and set aside factual determinations only if shown to be clearly erroneous. *Roland Machinery v. Dresser Industries,* 749 F.2d 380, 392 (7th Cir.1984).

## II. THE RAILWAY LABOR ACT: MAJOR OR MINOR DISPUTE

The Railway Labor Act is designed to channel labor disputes into constructive resolution proceedings as a means of avoiding interruptions to commerce among the states. *Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 148–149 n. 13, 90 S.Ct. 294, 298–299 n. 13, 24 L.Ed.2d 325 (1969); *Railway Labor Exec. Ass'n v. Pittsburgh & Lake Erie R.R.,* 845 F.2d 420, 423 (3d Cir.), *cert. granted,* ___ U.S. ___, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988); 45 U.S.C. § 152 (disputes are to be settled to "avoid any interruption to commerce or to the operation of any rail carrier").

In order to maintain equal bargaining ability while preserving uninterrupted commercial and rail activity, two distinct avenues for dispute resolution are provided by the RLA. Each prescribed avenue is dependent upon the categorization of the dispute, whether major or minor.[4]

■ Major disputes are limited to those disputes which arise in the absence or silence of a collective bargaining agreement. Only disputes that cannot be resolved through interpretation or analysis of a collective bargaining agreement are considered major. A major dispute:

> relates to * * * the formation of collective bargaining agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

*Elgin, Joliet & Eastern Ry. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290.

■ In contrast, minor disputes include grievances and all those disputes in which a collective bargaining agreement applies as to the disposition of the dispute. While the interpretation or application of the agreement may be questioned in a minor dispute, existence of a collective bargaining agreement is unquestioned. A minor dispute:

> contemplates the existence of a collective bargaining agreement already concluded, or at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The [minor] dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.... In either case the claim is to rights accrued, not merely to have new ones created for the future.

*Burley,* 325 U.S. at 723, 65 S.Ct. at 1290. Thus minor disputes cover all those disputes explicitly governed by the collective bargaining agreement, as well as those adopted by the agreement through practice and custom.

Identifying the type of dispute is a necessary prerequisite for determining which statutorily designated avenue of resolution must be followed. Each avenue recognizes the broader implications underlying the respective types of disputes. Consequently, each procedure of dispute resolution is designed to promote the goals of the RLA.

---

**4.** The terms "major" and "minor" disputes are judicially created nomenclature for the statutorily designated categories; neither term appears on the face of the statute. *Railway Labor Exec. Ass'n v. Pittsburgh & Lake Erie R.R.,* 845 F.2d 420, 424 n. 1 (3d Cir.1988). Rather, the statute refers only to "disputes concerning rates of pay, rules, or working conditions," 45 U.S.C. § 151a(4) (major), and "disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions," 45 U.S.C. § 151a(5) (minor). See *Elgin, Joliet & Eastern Ry. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945), where the terms were created.

While both dispute resolution procedures contemplate negotiations as the first step towards settlement, thereafter the paths diverge. Because major disputes concern the creation of contractual rights, not enforcement of established rights, and pose the greatest threat to the goals of the RLA, *viz.*, interruptions to commerce and labor strife, such disputes are designed to be settled by the parties themselves through negotiation and mediation under the auspices of the National Mediation Board. If that fails, then the procedure allows for acceptance or rejection of binding arbitration as well as cooling-off periods. During this time, the status quo prevails. 45 U.S.C. §§ 155, 156, 160. Therefore the carrier cannot unilaterally implement its plans, but must "preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved or related to that dispute." *Detroit & Toledo Shore Line Ry. Co. v. United Transp. Union*, 396 U.S. 142, 152–153, 90 S.Ct. 294, 300–301, 24 L.Ed.2d 325 (1969). The parties are not under compulsion to agree specifically, but, rather to exhaust all possibilities of conciliatory, negotiated agreement before resorting to self-help. After the RLA procedures are exhausted, if a strike ensues over a major dispute, the Norris–LaGuardia Act (29 U.S.C. §§ 106–115) precludes injunctive relief.

In contrast, minor disputes arise more often and call into question grievances and the interpretation or enforcement of vested contractual rights. Ostensibly the parties have previously assented to the various rights and obligations attendant to a collective bargaining agreement and all that remains is determination of those rights and obligations. Consequently, the procedure for resolving a minor dispute is binding arbitration before the National Railroad Adjustment Board or a special adjustment board. *Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). In contrast to a major dispute, where the contractual rights and obligations in issue have not yet been negotiated and arbitration could be futile, a minor dispute involves issues which the collective bargaining agreement addresses; the parties have already negotiated and agreed upon how to govern such a dispute and usually all that is required to settle the dispute is contract interpretation. And, unlike a major dispute, the carrier may "continue to apply its interpretation of the agreement" and accordingly implement its view of the issue pending decision by the Adjustment Board. Moreover, the union is prohibited from striking pending and following the decision of the Adjustment Board. *Chicago River & Indiana R.R.*, *supra*.

The initial issue thus posed to this Court: Is the dispute between the carriers—Burlington and Winona Bridge—and the Unions—UTU and BLE—a major or a minor dispute? If the dispute is minor, the district court should have enjoined the threatened strike as prayed by the carriers; if the dispute is major, as the district court held, it should have issued a status quo injunction enjoining railroad alteration of the prior working conditions and practices pending mediation.

Burlington reminds the Court of our past admonition, " 'if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor.' " (Br. 36) (quoting *Railway Labor Exec. Ass'n v. Norfolk & Western Ry.*, 833 F.2d 700, 705 (7th Cir.1987)). While that is the true standard, we agree with the district court's assessment that "the dispute here between UTU and Burlington regarding working conditions on trains operated pursuant to the trackage rights agreement is a major dispute subject to the mandatory bargaining and status quo provisions of the RLA." 688 F.Supp. 1261, 1266 (N.D.Ill. 1988). Our responsibility is not to weigh the merits of Burlington's argument, because we only have jurisdiction to determine whether the dispute is arguably resolved by reference to the collective bargaining agreement. We keep in mind that if the parties disagree as to whether reference to their collective bargaining agreement can resolve the dispute:

the dispute is minor unless the carrier's claims of contractual justification are 'frivolous' or 'obviously insubstantial.' The court does not consider the merits of the underlying dispute; its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision.

*Norfolk & Western Ry.*, 833 F.2d at 704, quoting *Atchison, Topeka & Santa Fe Ry. v. United Transp. Union*, 734 F.2d 317, 321 (7th Cir.1984) (additional citations omitted). If so, Congress has committed the resolution of the dispute to the National Railroad Adjustment Board.

The collective bargaining agreement need not explicitly address the dispute in issue because a collective bargaining agreement embodies terms not necessarily express but nonetheless included by implication. It is well established that a dispute over the practice of a carrier is governed by the collective bargaining agreement, and thus minor, if it is shown that the carrier acted similarly in the past with the union's knowledge and acquiescence. *Detroit & Toledo Shore Line R.R.*, 396 U.S. at 153–154, 90 S.Ct. at 301–302; *National Ry. Labor Conf. v. International Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741, 747 (7th Cir.1987); *Maine Central R.R. v. United Transp. Union*, 787 F.2d 780 (1st Cir.1986), certiorari denied, 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 The past practice in effect becomes a part of the implied-in-fact contract between the carrier and union, and such disputes amount to an interpretation of the contract.

The relevant collective bargaining agreements here are silent as to trackage rights agreements and any attendant changes. Burlington, however, argues that the Unions have acquiesced in numerous (forty in the past decade) such transactions and always found ICC-imposed employee protective conditions satisfactory in the past. Prior to this consolidated suit, the Unions have not protested or disputed a single Burlington trackage rights agreement. None of such previous agreements had been subjected to mandatory bargaining. Therefore, Burlington contends, the right to engage freely in trackage rights agreements is permitted under the implied-in-fact terms of the collective bargaining agreement, so that a minor dispute is involved.

But Burlington has shaded the issue. This dispute does not simply concern, as Burlington suggests, the type of trackage rights agreement in which the Unions have repeatedly acquiesced. Rather, this is an attempt by a carrier to evade unilaterally the statutory and contractual rights vested in the Unions through the use of a trackage rights agreement destined to convey rights over its Northern Line, approximately 1,800 miles of track, to a wholly owned, five-employee subsidiary which utterly lacks any of the necessary equipment to service such a line. As far as the record shows, Burlington has failed to show that the Unions have established a pattern of mutual assent, understanding or acquiescence as to a trackage rights agreement with a wholly owned Burlington subsidiary granting wholesale rights over 1,800 miles of track with the potential for a huge diversion of business and the resulting possibility of a unilateral denial of statutory and contractual rights. See, *e.g., Brotherhood of Maint. of Way Employees v. Chicago & North Western Transp. Co.*, 827 F.2d 330 (8th Cir.1987). Our major dispute holding is not tainted by judging the merits of the claim itself, as Burlington has suggested with respect to the trial court's decision. Rather, our determination narrowly focuses on whether Burlington has put forth a credible argument that the dispute in issue may be resolved by application of the collective bargaining agreement, and Burlington's claim that the issue here is resolvable by reference to the collective bargaining agreement unduly strains the imagination. Burlington's argument that it has an implied contractual right to alter unilaterally crew consists is simply too insubstantial to sustain.

The case at bar is easily distinguished from *Air Line Pilots Ass'n v. Eastern Air Lines*, 863 F.2d 891 (D.C.Cir.1988), cited by Burlington. There the Court of Appeals for the District of Columbia Circuit vacated a

preliminary injunction entered by the district court enjoining Eastern from furloughing employees in furtherance of a planned work reduction. The Union asserted that the planned furloughs represented a unilateral change in working conditions subject to the major dispute resolution procedures of the RLA. This argument was rejected because the collective bargaining agreement explicitly addressed the issue of furloughs, and furloughs had been effected in the past. 863 F.2d at 900. The court also rejected the Union's contention that the large number of employees scheduled to be furloughed distinguished the dispute from the terms of the collective bargaining agreement and past practices, holding instead that the extent of planned work reduction and furloughs was in fact consistent with the collective bargaining agreement and past practices. *Id.* at 900. Finally, the court uncovered no evidence of an intent by Eastern to shift business to a less unionized affiliate carrier. *Id.* at 903–908.

The facts here completely distinguish this case from *Air Line Pilots Ass'n.* As already discussed, this dispute is not simply over Burlington's decision to grant trackage rights to another carrier. Rather, the dispute is more properly framed as an attempt by Burlington to alter unilaterally crew consists over its Northern Line. The trackage rights agreement is merely the vehicle designed to effect the change. Insofar as the Court in *Air Line Pilots Ass'n* attached significance to the failure of the Union to show anti-union animus or intent to shift business to a less unionized affiliate, here the Unions have shown both indicia of anti-union animus and that business will be diverted to Burlington's wholly owned subsidiary due to its anticipated lower labor costs.

Burlington also relies on our decision in *Chicago and North Western Transp. Co. v. Railway Labor Exec. Ass'n,* 855 F.2d 1277 (7th Cir.1988), decision stayed, 57 U.S. L.W. 3185 (Stevens, J.). In that case, this Court held that the carrier's argument that a sale of a portion of the business and the resulting loss of jobs was comprehended by the explicit language as well as the past practice of the collective bargaining agreement was "at least plausible." 855 F.2d at 1285. Since oral arguments here, that decision has been stayed pending the Supreme Court's action upon the petition for certiorari, and the injunction against a threatened strike lifted by Justice Stevens, thus casting some uncertainty as to the case's authority. Here, while Burlington may have a plausible argument that the collective bargaining agreement envisions trackage rights agreements, no such argument exists for Burlington's unilateral right to alter crew consists. Burlington's claim of contractual justification is "so obviously insubstantial as to indicate that it is attempting to circumvent § 6 RLA major dispute resolution procedure." 855 F.2d at 1285 (citations omitted).

Burlington's own conduct undermines its position. As it was—and still is—required to do, Burlington first negotiated with the Unions for the change in crew consists of the Expediter Service. Only after preliminary negotiations proved unsuccessful did Burlington attempt the trackage rights agreement. Burlington left little doubt that it was intentionally avoiding its obligations to the Unions when it sent a letter to all its employees explaining the agreement with Winona Bridge and reading in relevant part:

> Although [Burlington] has held a number of meetings with representatives of the general committees on the Northern routes, *we have not been able to reach agreement.* As a result, [Winona Bridge] has asked the United Transportation Union and Brotherhood of Locomotive Engineers (BLE) internationals to begin negotiations on March 17 in St. Paul regarding representation of employees on a [Burlington] subsidiary, the Winona Bridge Railway Company ...

> \* \* \* \* \* \*

> WBBR [Winona Bridge] is BN's [Burlington's] *second choice.* BN would have preferred to have successfully negotiated with the UTU Northern Line committees to make BN more competitive. Because representatives of the

committees have been unwilling to negotiate the necessary agreement, WBBR will begin operations as soon as it can obtain union representation and finalize customer contracts. * * * Appellants' App. at Tab 4, p. 1. See 688 F.Supp. 1261, 1264 (N.D.Ill.1988) (emphasis in original).[5] Thus Burlington plainly acknowledged that Winona Bridge was Burlington's second choice, an alternative to unsuccessful union negotiations. Disappointed with the Unions' response, Burlington simply attempted to sidestep any continuing obligations by securing the trackage rights agreement.

On December 4, 1987, UTU served notice, as required by Section 6 of the RLA (45 U.S.C. § 156), of a proposed change in agreements in order to provide that all trains of Winona Bridge on Burlington lines be manned by Burlington employees pursuant to Burlington's collective bargaining agreement with the UTU. Thereafter Burlington initiated voluntary discussions with the UTU. When these preliminary discussions proved unsuccessful, Burlington submitted the dispute to the National Mediation Board, the initial step in the major dispute resolution mechanism, and adhered to the original proposal that Winona Bridge should be able to hire a new group of employees. Consequently, Burlington's own actions support the conclusion that the entire dispute is major.

 The fact that Winona Bridge would operate the trains, not Burlington, its parent corporation, is of no consequence. The district court was correct in holding that a carrier cannot evade its duties under a collective bargaining agreement or the RLA by directing business to an entity within the same corporate family and not obligated by the existing collective bargaining agreement. 688 F.Supp. 1261, 1266–1267 (N.D.Ill.1988), citing *International Ass'n of Machinists and Aerospace Workers v. Eastern Airlines*, No. 87–1720, 127 L.R.R.M. 3078 (D.D.C.1988) [1988 WL 25506], vacated and remanded on other grounds, 849 F.2d 1481 (D.C.Cir.1988); *Butte, Anaconda & Pacific Ry. v. Brotherhood of Locomotive Firemen and Engineers*, 268 F.2d 54 (9th Cir.1959), certiorari denied, 361 U.S. 864, 80 S.Ct. 124, 4 L.Ed.2d 104.

 This case is remarkably similar to *Butte*. There too a transfer between a parent and its wholly owned subsidiary was undertaken for the purpose of defeating union negotiation. The Ninth Circuit rejected the argument that the transfer eliminated the dispute and explained:

Here, however, the carrier is the wholly-owned subsidiary of the shipper * * * [T]he two have common principal officers and the unified purpose of serving the ultimate best interests of the shipper. Under these circumstances the act of [the subsidiary] in taking over the switching service, to be performed by employees represented by another union, must be regarded as the act of the [parent corporation].

268 F.2d at 59. Consequently, the court of appeals held that a major dispute was still involved and that therefore the mediation provision of the RLA was controlling so that an injunction against a strike threat was unwarranted. The same rationale applies to the assumption of the Expediter Service by Winona Bridge. Winona Bridge is not an independent carrier [6] but is mere-

---

5. The letter also informed the employees that in June 1987, when Burlington was negotiating with UTU, Burlington informed the Union that without the changes, Burlington would be forced to take steps that would not be in the best interests of the railroad or the employees. Moreover, the letter continued to urge employees to negotiate revised crew consist agreements, arguing that failure to do so will "result in *lost income to present [Burlington] employees*." Appellants' App. at Tab 2, p. 3.

6. The letter sent from Burlington to its employees highlights this obvious proposition. See note 5, *supra*. Not only did Burlington admit this action was taken only as a second-best measure to a negotiated agreement with the Unions, but Burlington still continued to urge for a revised crew consist agreement. In fact, in its letter to employees, Burlington wrote that on June 7, 1987, it informed UTU that a failure in negotiations would mean that "[Burlington]" would have "to hire new employees." If Burlington and Winona Bridge were truly distinct entities, further negotiation would have been

ly an extension of Burlington. As such, Burlington cannot evade its responsibilities by transferring rights to an extension of itself. *Butte.*

Burlington argues that Winona Bridge will only service "new" business while all existing business will remain with Burlington. Since, according to Burlington, the new work being transferred to Winona Bridge is not included in the present collective bargaining agreement, it supposedly is not a matter subject to mandatory bargaining. We are not persuaded.

As the district court noted, the Burlington trackage rights agreement with Winona Bridge contemplates future additional transfers of business to Winona Bridge.[7] 688 F.Supp. 1261, 1267 (N.D.Ill.1988). The prospect of having work shifted to a replacement subsidiary is itself a change in working conditions and practices subject to the status quo and mandatory bargaining practices of the RLA, including the services of the National Mediation Board. *Air Line Pilots Ass'n v. Transamerica Airlines,* 817 F.2d 510 (9th Cir.1987).

The deprivation of a work opportunity to these employees is also a change in working conditions. "The deprivation of a work opportunity involving the type of work traditionally performed by the Union is a change in working conditions, even where the work is new." *Transport Workers Union v. Eastern Air Lines,* 544 F.Supp. 1315, 1327 (E.D.N.Y.), affirmed and modified, 695 F.2d 668 (2d Cir.1982). Burlington itself recognized the intimate connection between work opportunity and present working conditions in its letter to its employees. See note 5 *supra.*

The distinction claimed between new and existing business deserves close analysis. If a carrier truly developed new business, quite apart from that already performed by employees pursuant to a collective bargaining agreement, and that new work was transferred to another corporation, it might fall outside the bounds of the collective bargaining agreement. But when, as here, a carrier claims that the business it will be able to attract with lower prices obtained by evading Union costs is new, the business might be new but the work is not. It is work controlled by the labor agreements. Moreover, Burlington fails to distinguish new business from normal turnover. The rail carrier industry, like most businesses, is not static. In any given year, old accounts may fade while new accounts are welcomed. Under Burlington's definition of new business, all turnover may be channelled to Winona Bridge, the extreme result being an eventual wholesale shift of business to Winona Bridge, while the cumulative amount of business of Burlington and Winona Bridge remains constant. Burlington's argument would apparently consider as new business every customer who calls hereafter for service on this Northern Line.

In the instant case, the claimed distinction between "old" and "new" business is illusory. This case is distinguishable from *Air Line Pilots Ass'n v. Texas Internat'l Airlines,* 656 F.2d 16 (2d Cir.1981). There the Second Circuit determined that the creation of a new subsidiary to service an air

moot following the trackage rights agreement. In his dissent, ICC Vice Chairman Lamboley also questioned whether Winona Bridge was "another carrier:"

The agreement here is an intracorporate grant of lengthy trackage rights by a parent to its wholly-owned, nonoperating, one-mile long subsidiary which has no equipment or rail-service employees; [Burlington] will necessarily supply all * * *. This is obviously not a typically bargained, two-sided trackage rights agreement between carriers.

 \* \* \* \* \* \*

Accordingly, one cannot help but glean from the record the obvious possibilities: [Burlington] intends to use the trackage rights and

[Winona Bridge's] corporate shell to transfer increasing levels of its present operations on the line to [Winona Bridge].
F.D. No. 31163 at 7 (Vice Chairman Lamboley dissenting).

7. Although the trackage rights agreement ostensibly limits Winona Bridge to service points in St. Paul, Spokane and Seattle, the agreement can of course be modified to include other such points as Burlington may authorize in writing. Further, the agreement does not preclude swap arrangements whereby Burlington would sell existing business to a third carrier for new business that would be directed to Winona Bridge.

route not being serviced by an established subsidiary was not a diversion of existing business, but was new business not within the purview of the collective bargaining agreement. But the situation here is instead comparable to *Air Line Pilots Ass'n v. Transamerica Airlines*, 817 F.2d 510 (9th Cir.1987), in which the Ninth Circuit found a diversion of present business. A crucial difference noted by the Ninth Circuit was that the subsidiary to which business was diverted would operate in the same market place. 817 F.2d at 525.

Here, as in *Transamerica*, Burlington is not transferring new business to Winona Bridge. Winona Bridge will be operating trains (very likely Burlington-owned trains) over Burlington tracks and covering the exact same geographic market as currently serviced by Burlington. The only appreciable difference will be the cost of the Expediter Service, which is less than the traditional Burlington service. This lowered cost, however, is attributable in whole or significant part to lower labor costs accomplished by sidestepping the collective bargaining agreement.

To hold otherwise would undermine the RLA. A carrier would be free to evade virtually every collective bargaining agreement on the flimsy assertion that the "new" business is business that the carrier could not have obtained while operating under the collective bargaining agreement. Under Burlington's plan all business which can be solicited by undermining labor contracts would be new business, since the business could not be obtained due to the labor costs under the collective bargaining contract. Such an argument is tortured and must be rejected. The district court properly held that regardless of the masquerade, this dispute is a "major" one requiring compliance with the RLA terms governing such disputes and not permitting injunctive relief.

## III. THE INTERSTATE COMMERCE ACT

 Burlington and Winona Bridge urge this Court to hold that the RLA is superseded *pro tanto* by the ICA. Essentially, both argue that regardless of our disposition of the major-minor dispute issue, the bargaining procedures mandated by the RLA are inapplicable because the ICC, which has exclusive jurisdiction to approve and regulate trackage rights agreements, approved the transaction between the two carriers and imposed statutorily required labor protective conditions under a post-RLA provision of the ICA. Consequently, according to appellees the transaction is cloaked with a statutory grant of immunity from any laws that interfere with the transaction. We did not need to resolve a similar superseding question in *Chicago and North Western Transp. Co. v. Railway Labor Exec. Ass'n*, 855 F.2d 1277 (7th Cir.1988), decision stayed, 57 U.S.L.W. 3185 (Stevens, J.), nor do we resolve it here.

The purported conflict between the pertinent later provisions of the Interstate Commerce Act and the Railway Labor Act is admittedly not easily resolved. Only a few Circuits have taken the opportunity to address it, and the results have been less than consistent.[8] Our burden is eased by the facts of this case which permit a result compatible with both statutes.

The railroad industry has for some time been in serious decline. Congress has recognized this situation and taken steps to revitalize the industry, primarily by removing many of the regulatory impediments interfering with rail transactions and allowing competitive pricing. The first major amendment to the ICA since 1940 was the Railroad Revitalization and Regulatory Re-

---

**8.** There is a division among the Circuits that have already addressed this issue. Compare, e.g., *Railway Labor Exec. Ass'n v. Pittsburgh & Lake Erie R.R.*, 845 F.2d 420 (3rd Cir.1988) (enjoining ICC-approved transaction due to a major dispute), and *Railway Labor Exec. Ass'n v. City of Galveston*, 849 F.2d 145 (5th Cir.1988) (enjoining ICC-approved transaction due to ma-

jor dispute), with *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794 (1st Cir.1986), certiorari denied, 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (held that ICA supersedes portions of RLA); *Railway Labor Exec. Ass'n v. Chicago and Northwestern Transp. Co.*, 848 F.2d 102 (8th Cir.1988) (held that ICA supersedes portions of RLA).

form Act of 1976 ("4–R Act"), Pub.L. No. 94–210, 90 Stat. 31. The 4–R Act was designed to remove unnecessary barriers which prohibited railroads from competing with other modes of transportation, while at the same time maintaining necessary protection for rail customers. S.Rep. No. 499, 94th Cong. 2d Sess. 1, U.S.Code Cong. & Admin.News 1976, p. 14. Particular attention was accorded to streamlining the ICC regulatory processes, with an emphasis on mergers, consolidations and certain other forms of rail transactions. *Id.* at 15–21, U.S.Code Cong. & Admin.News 1976, pp. 28–35.

The 4–R Act proved to be too little to halt the decline. By 1980, the railroad industry remained beset with financial difficulties which threatened vast segments of the industry. Congress responded in 1980 by creating the Staggers Rail Act, Pub.L. No. 96–448, 94 Stat. 1895.[9] The Staggers Act recognized that many of the regulations imposed upon the railroad industry were outdated. Originally, the ICA was essential "to prevent an abuse of monopoly power by railroads and to maintain a national railroad network as an essential part of the national transportation system." Staggers Conf.Rep. No. 1430, 96 Cong. 2d Sess. 79, U.S.Code Cong. & Admin.News 1980, pp. 3978, 4110–4111. By 1980, however, two thirds of intercity transportation was conducted by means other than rail; rail earnings were the lowest of any carrier industry; capital shortfalls between $16 billion and $20 billion were expected. *Id.* The overall purpose of the Staggers Act

was to "provide, through financial assistance and freedom from unnecessary regulation, the opportunity for railroads to obtain adequate earnings to restore, maintain and improve their physical facilities while achieving the financial stability of the national rail system." *Id.* at 80, U.S.Code Cong. & Admin.News 1980, at p. 4111.

Significant portions of the Staggers Act streamlined the regulatory process by either relieving the ICC from conducting investigations and hearings altogether, or shortening the time frame for mergers, consolidations and certain other rail transactions. The Staggers Act required the ICC to reduce its regulatory procedure for those transactions which are routinely and consistently approved. *Id.* at 120, U.S. Code Cong. & Admin.News 1980, at p. 4152. One of the most significant features, and certainly a clear example of Congress' intent for immediate deregulation, was the exemption procedure, in which the ICC was instructed to grant exemptions from regulation and then conduct post-hoc reviews. The "class exemptions" are to be granted "whenever regulation is not needed to protect abuses of market power." *Id.* at 105, U.S.Code Cong. & Admin.News 1980, at p. 4137. Congress entrusted the ICC with identifying the "specific regulatory provisions and practices * * * to determine where they can be deregulated consistent with the policies of Congress; the stated policy explicitly lists deregulation over the national rail system in general and reducing regulatory barriers to entry and exit from the industry as factors." *Id.*[10] The

---

**9.** See generally, Note, *Fine–Tuning Deregulation: The Interstate Commerce Commission's Use of Its General Rail–Exemption Power,* 53 Geo.Wash.L. Rev. 827 (1985).

**10.** The national railroad transportation policy is codified at 49 U.S.C. § 10101a. The fifteen factors constituting federal rail policy, of which labor is but one (the twelfth), are:

(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;

(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and national defense;

(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;

aim was to reduce ICC regulatory exercise to those instances where "necessary to protect against abuse of market power where other federal remedies are inadequate." *Id.* It was decided that this determination should be made, if at all, in a post-hoc hearing.

Congress clearly envisioned swift and efficient approval of rail consolidations, mergers and grants such as the type at issue. This Court is reluctant to take any action which would disturb the process encouraged by Congress through its 1980 amendments of the ICA. At the same time, it should be noted that Congress has not made any substantial revisions in the RLA since 1934. Ours is not the first Circuit impressed by this inaction. See *Railway Labor Exec. Ass'n v. Pittsburgh & Lake Erie R.R.*, 845 F.2d 420 (3rd Cir. 1988). Fortunately, this case does not require a determination which would offend the policies and goals of either Act. Rather, the primary relief requested concerns a labor dispute, not the trackage rights agreement itself.

Section 10505 of the ICA authorizes the ICC to exempt rail transportation but not "to relieve a carrier of its obligation to protect the interests of employees." Section 11343(a) requires Commission approval of trackage rights agreements such as involved here, and Section 11344 covers the procedure therefor. In turn, Section 11347 requires labor protective conditions in Section 11344 cases. The carriers thus postulate that since Section 11341(a) provides that a carrier in an exempt transaction such as the Burlington–Winona Bridge trackage rights agreement "is exempt from the antitrust laws and *from all other laws* * * * *", the carrier is only bound by the labor protective provisions which the Commission's exemption condition made applicable here to "any employees affected by the trackage rights" (Carriers' App. Tab 2). The trouble is that the carriers have ignored the statutory language following "from all other laws." The entire phrase reads "is exempt from the antitrust laws and all other laws, including State and municipal law, *as necessary* to let that person carry out the transaction, hold, maintain, and operate property, and exercise control over franchises acquired through the transaction" (emphasis supplied). The RLA will not preclude consummation of the transaction and thus does not meet the "necessary" qualification, so that the trackage rights agreement is not freed entirely from the RLA by the language in Section 11341(a) as the carriers contend.

The RLA is not rendered nugatory by ICC-approved transactions. To the contrary, the RLA still governs this labor dispute; the district court merely erred in the breadth of relief granted, not the substance. As we stated previously, the trackage rights agreement per se does not make this a major dispute; rather the use of a trackage rights agreement, via a shell subsidiary, to abrogate a collective bargaining agreement constitutes a major dispute.

 Regardless of whether the ICA superseded the RLA, the injunction enjoining the trackage rights agreement was errone-

(7) to reduce regulatory barriers to entry into and exit from the industry;

(8) to operate transportation facilities and equipment without detriment to the public health and safety;

(9) to cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;

(10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;

(11) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;

(12) to encourage fair wages and safe and suitable working conditions in the railroad industry;

(13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;

(14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; and

(15) to encourage and promote energy conservation.

ous because the injunction was needlessly overbroad. An injunction should be narrowly tailored to serve equity's interest.[11] In this instance, given the singularity of interests of Burlington and Winona Bridge, a proper injunction should only have enjoined unilateral changes in working conditions by either Burlington or Winona Bridge pending RLA procedures, regardless of the status of the trackage transaction. Because we hold that Winona Bridge, as the alter ego of the Burlington, is bound by the existing collective bargaining agreements, it is unnecessary to decide whether the RLA is superseded in part by the ICA. The preliminary injunction granted by the district court should not have interfered with the trackage rights agreement. In that way, the RLA and ICA provisions would not have conflicted.

The ICA, by virtue of the Staggers Act exemption, arguably divests the courts of jurisdiction to enjoin the proposed trackage rights agreement itself. Nevertheless since Winona Bridge is the alter ego of its parent Burlington, like the situation in *Butte*, the RLA compels a status quo injunction as to the planned unilateral changes in working conditions pending RLA procedures. Even though the Staggers Act may prevent enjoining the trackage rights agreement, an injunction should be granted under the RLA to maintain the status quo with respect to working conditions.

This determination is not inconsistent with 49 U.S.C. § 11347, which provides for

mandatory labor protective conditions in exemption cases of this nature.[12] See *Norfolk and Western R. Co.—Trackage Rights—Burlington Northern, Inc.*, 354 I.C.C. 605 (1978), modified, *Mendocino Coast Ry.—Lease and Operate—California Western R.R.*, 360 I.C.C. 653 (1980), affirmed *sub nom. Railway Labor Exec. Ass'n v. United States*, 675 F.2d 1248 (D.C. Cir.1982). Moreover, Section 11347, in conjunction with the *Mendocino* labor protective conditions, also stipulates "retention of '[t]he rates of pay, rules, working conditions and all collective bargaining and other rights, privileges and benefits * * * unless changed by future collective bargaining agreements or applicable statutes.'" *Interstate Commerce Comm'n v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 107 S.Ct. 2360, 2363–2364, 96 L.Ed.2d 222 (1987), citing *Norfolk and Western*, 354 I.C.C. at 610.

Section 11347, as interpreted by the ICC with Supreme Court approval, requires that the existing collective bargaining agreement be preserved, and since we have determined that in the setting of this case Winona Bridge does not represent an employer distinct from Burlington, an injunction requiring Winona Bridge to bargain with the Unions is consistent with the ICC-prescribed labor protective conditions. Our decision merely binds Winona Bridge to respect contractual obligations preserved not only under the RLA, but under the ICA as well.

---

**11.** This Court of course gives substantial deference to a district court's decision to grant a preliminary injunction. *Lawson Products v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir.1986). An important consideration is whether the proposed injunction will disserve the public interest. Given Congress' intent to promote efficient rail transactions, the unnecessarily broad scope of the district court's injunction, and the option of a narrower injunction, the scope of the granted injunction is too broad to further the vital public interest embodied in the ICA.

**12.** 49 U.S.C. § 11347 provides:
When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565). Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees. The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action became effective, for that lesser period).

As noted previously, Burlington and Winona Bridge are for purposes of this case one and the same under the rationale of *Butte*. Therefore an injunction may issue prohibiting Winona Bridge from implementing any unilateral changes in working conditions, including changes in crew consists, pending the major labor dispute resolution as prescribed by the RLA. Our exercise of jurisdiction and consequent approval of injunctive relief consistent with the RLA in no way challenges Burlington's and Winona Bridge's trackage rights agreement under the ICA. The agreement may proceed apace, but unilateral changes in working conditions may not be implemented regardless of the status of the proposed trackage rights transaction.

## IV. COLLATERAL ATTACK

██ Burlington and Winona Bridge urge this Court to hold that the Unions' claim under the RLA constitutes an impermissible attack on an ICC order, whereas ICC orders are only reviewable pursuant to 28 U.S.C. §§ 2321 and 2342, and exclusively by the Courts of Appeals. Burlington cites *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794 (1st Cir.1986), in support of its argument. In *Boston & Maine*, the First Circuit determined that a union prayer for injunctive relief enjoining an ICC-approved trackage lease agreement based upon the RLA major dispute provisions constituted an impermissible collateral attack on the ICC approval. Although the cases are facially similar, at least one crucial difference exists: The parties to the agreement in *Boston & Maine* were in fact distinct entities whereas Burlington and Winona Bridge represent a singular interest. Consequently, the trackage rights agreement is not disturbed by requiring bargaining after the ICC authorization. Moreover, the actions now pursued by the Unions differ fundamentally from their challenge before the ICC. Although both attacks may have been initiated for identical reasons, the ICC challenge was premised on the transaction's alleged infirmity for failure to comply with the public convenience and necessity policy expressed in 49 U.S.C. § 10901. Here the Unions have pressed RLA claims which are independently cognizable and addressable irrespective of the merits of the trackage rights agreement transaction before the ICC.

## V. THE NORRIS–LA GUARDIA ACT

Finally, Burlington and Winona Bridge urge this Court to enjoin a threatened strike by the Unions. The Unions have threatened to strike since Burlington has refused to follow the procedures for resolution of a major dispute as set out in the RLA.

We have already determined that the dispute in issue is major. Therefore, pursuant to the RLA, the status quo must prevail until the major dispute resolution procedures have been exhausted or the two sides agree. In the meantime each side, carriers and Unions, is forbidden from engaging in self-help or unilateral implementation of its plan.

If a carrier would alter the prevailing status quo, such a unilateral change in working conditions would effectively upset the Unions' bargaining leverage and ability to reach a fair settlement. See *Detroit & Toledo Short Line R.R. v. United Transp. Union*, 396 U.S. 142, 150, 90 S.Ct. 294, 299, 24 L.Ed.2d 325; *Local 879, Allied Indust. Workers v. Chrysler Marine*, 819 F.2d 786, 788 (7th Cir.1987). In such an instance, where the "carrier refuses to follow the procedures of the Act, * * * the Union may strike." *United Indust. Workers v. Board of Trustees of Galveston Wharves*, 400 F.2d 320, 334 (5th Cir.1968) certiorari denied, 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

██ Burlington and Winona Bridge have thus far failed to comply with the RLA mandatory bargaining procedures. Accordingly, under Section 8 of the Norris–LaGuardia Act, 29 U.S.C. § 108,[13] they are

13. Section 8 provides:

No restraining order or injunctive relief shall be granted to any complainant who has

precluded from seeking relief from the Unions' threatened strike. As the Supreme Court explained:

> If a complainant has failed (1) to comply with any obligation imposed by law or (2) to make every reasonable effort to settle the dispute, he is forbidden relief.

*Brotherhood of R.R. Trainmen v. Toledo, Peoria & Western R.R.*, 321 U.S. 50, 56–57, 64 S.Ct. 413, 416–417, 88 L.Ed. 534 (1944). Because Burlington has so far failed to proceed with the RLA major dispute resolution procedures,[14] Burlington—and Winona Bridge—are precluded from seeking relief against the threatened strike.

## CONCLUSION

To summarize, we conclude that a dispute resulting from a rail trackage rights agreement where a carrier leases trackage rights to a wholly owned, completely dependent subsidiary for the sole purpose of avoiding its RLA and contractual responsibilities, is a major dispute subject to resolution under the RLA rather than by injunction against the Unions in violation of the Norris–LaGuardia Act. The trackage rights agreement in issue here was a substantial part of a scheme to evade contractual obligations and the attendant duty to negotiate in good faith. The planned changes in the crew consist have no basis in the collective bargaining agreement so that there is no minor dispute entitling the carriers to an injunction. Although the Unions in the past may have acquiesced in trackage rights agreements, they have never acquiesced in a trackage rights agreement whose purpose is to defeat a collective bargaining agreement.

The ICC approval of the trackage rights agreement does not render the RLA nugatory nor did it divest the district court of jurisdiction to enforce compliance with the RLA. The relief sought by the Unions and authorized pursuant to the RLA may be ordered without upsetting the trackage rights agreement. The relief that should be granted, as in all instances of preliminary injunctions, must be narrowly tailored. A proper injunction will not disturb the ICC-approved transaction, but will nonetheless protect the employees from a unilateral change in the collective bargaining agreement. Thus the trackage rights transaction may be consummated, but Burlington cannot escape its collective bargaining responsibilities through its alter ego, Winona Bridge. Burlington and Winona Bridge, for purposes of this case, are one and the same, and an injunction may issue enjoining any activity of theirs which would upset the present labor conditions. Insofar as the trackage rights transaction has no impact per se on labor conditions, it may proceed, but any plans to implement labor changes, including crew consists, must be enjoined pending full RLA major dispute resolution procedures.

We vacate the order of the district court and remand for formulation of a preliminary injunction consistent with this decision.

---

failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery or mediation or voluntary arbitration.

**14.** But see note 2 *supra.*