Fred A. HUBBS and Nancy J. Hubbs, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 657–88 C.

United States Claims Court.

May 14, 1990.

William B. Paynter, Jr., Akron, Colo., for plaintiffs.

Steven A. Hemmat, Washington, D.C., with whom was Stuart M. Gerson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

In 1985, Fred and Nancy Hubbs (plaintiffs) entered into a loan agreement with the Commodity Credit Corporation (CCC). For security, the CCC took an interest in 20,262 bushels of corn. In May 1986, plaintiffs decided to exercise one of their loan repayment options by selling the secured corn to a buyer. As instructed, plaintiffs informed the buyer to make payment with a draft instrument payable to the CCC.

The Government received the draft on or about July 3, 1986, but did not initiate the bank collection process until July 22, 1986. The bank subsequently returned the draft unpaid because the buyer's account had been closed. The buyer is now insolvent. The CCC has collected from plaintiffs' account the amount of the dishonored draft.

Plaintiffs contend that the Government breached the loan contract by failing to deposit the draft for approximately nineteen days. Plaintiffs assert that the Government owed them a fiduciary duty to negotiate the draft promptly.

Plaintiffs move for summary judgment under RUSCC 56. Defendant opposes this motion and cross-moves for summary judgment. After oral argument, this court grants defendant's cross-motion and denies plaintiff's motion.

## FACTS

Plaintiffs operate a farm in Colorado. On November 20, 1985, plaintiffs executed a Farm Storage Note and Security Agreement. The CCC—represented by the Agricultural Stabilization and Conservation Service (ASCS)—soon approved the agreement. The CCC loaned plaintiffs $52,-478.58 and took a security interest in 20,-262 bushels of corn. The CCC subsequently placed the corn under seal.

Plaintiffs decided to exercise one of their repayment options on the loan by selling the corn to Valley Feed and Seed, Inc. (Valley). This option required plaintiffs to execute a Marketing Authorization for Loan Collateral before release of the corn. Plaintiffs notified the ASCS office of their intent to sell the corn to Valley. The ASCS office sent plaintiffs an authorization form covering the period from May 8, 1986 through May 23, 1986. Plaintiffs did not sell the corn before the form expired on May 23.

Plaintiff Fred Hubbs contends that on May 29, 1986, he visited the ASCS office and obtained verbal permission to sell his corn to Valley. Mr. Hubbs states that the ASCS told him to make the check for the corn payable to the CCC. Plaintiff believed that the ASCS would soon send another authorization form. Plaintiffs sold the corn to Valley. Valley began hauling the corn on May 31, 1986.

On June 30, 1986, Valley contacted the ASCS office and requested the total debt to the CCC secured by plaintiffs' 1985 corn. The ASCS informed Valley that the amount was $55,135.58. Valley then issued a draft payable to the CCC in the amount of $53,-708.24. The ASCS received Valley's draft on or about July 3, 1986.

Ms. Patricia Glynn, an ASCS employee, informed plaintiff, Ms. Hubbs, and Valley of the discrepancy between the loan amount and the draft. The draft was $1,427.34 short of the amount owed on the

corn. Defendant contends that Ms. Glynn expected to receive a draft for the amount of the shortage within a few days. Ms. Glynn deposited the Valley draft in a safe to await payment of the rest of the debt. Ms. Glynn then departed for a two-week vacation. Plaintiffs did not deliver a draft to cover the shortfall during the next two weeks, but expected ASCS to process Valley's draft immediately.

The ASCS initiated the bank collection process on July 22, 1986. The Valley draft reached the First National Bank of Fort Morgan on July 28, 1986. The bank returned the draft due to closure of the Valley account.

The CCC had earlier removed Valley from its list of approved warehouses on May 22, 1986. Valley is now insolvent. Valley has never paid the draft. The CCC received full payment for the loan by deducting the amount of the draft from money the CCC owed plaintiffs for the spring of 1987. Plaintiffs state that this deduction forced them to recalculate their finances. Plaintiffs therefore claim additional losses in the sum of $40,559.76.

Plaintiffs filed this action in the United States Claims Court on December 12, 1988.[1] Plaintiffs contend that the CCC breached the loan contract by failing to deposit the draft for nineteen days after its receipt. Plaintiffs assert that the ASCS acted as their agent and had a fiduciary duty to negotiate the draft promptly. Plaintiffs believe that 19 days was an unreasonable length of time due to ASCS's purported knowledge of the unsound financial condition of Valley.

Defendant responds that the ASCS acted with reasonable care and diligence. Specifically, defendant argues that the Uniform Commercial Code (UCC) makes presentment within 30 days reasonable. U.S.C. § 3–503 (West ed. 1988).

## DISCUSSION

### Summary Judgment

■ When no material facts are in dispute, RUSCC 56 authorizes this court to resolve issues as a matter of law. *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144 (Fed.Cir.1983). A movant for summary judgment has the burden of showing the absence of any genuine issue of material fact. *Id.* at 1146. The movant also can discharge its burden by demonstrating that the nonmoving party failed to establish some element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

When evaluating the merits of a summary judgment motion, this court must view the facts from the perspective of the nonmovant. *Auld*, 714 F.2d at 1146. Mere denials, speculation, or bald assertions do not alone create conflicts of material fact. *Barmag Barmer Maschinenfabrik AG v. Murata Machine, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984).

### Express Contract

■ The Tucker Act gives the Claims Court jurisdiction to adjudicate "any express or implied contract with the United States...." 28 U.S.C. § 1491(a)(1) (1982). In the contract at issue, the CCC made no promises about the timing of draft presentment. The contract does not require the Government to present drafts within a specified time. Rather, the contractual documents expressly contemplate that plaintiffs bear the risk of loss if a particular method of satisfying their loan obligation fails.

The authorization form, which plaintiffs must complete to sell their collateral, imposes risk of loss on plaintiffs until the payment received by the CCC actually satisfies the indebtedness. The form states in pertinent part:

> I [plaintiffs] agree that CCC's consent for removal of the loan collateral will not release CCC's security interest in the goods removed, and will release me from my liability of the loan indebtedness only to the extent that actual payment for such indebtedness is received by CCC.

---

1. This action has been transferred from the United States District Court for the District of Colorado, Case No. 88F575.

Plaintiffs' Motion for Summary Judgment, filed Nov. 30, 1989, App., at 4.

The security agreement executed by the parties similarly placed risk of loss on plaintiffs. Section 6(j) made plaintiffs responsible for any loss in the quantity or quality of the commodity. Further, the security agreement reiterated the risk allocation established by the authorization form. Section 5(b) of the security agreement stated that "[t]his note evidences a loan made under price support regulations issued by CCC applicable to the commodity and published in the Federal Register." Defendant's Cross–Motion for Summary Judgment and Response, filed December 21, 1989, Appendix, at 2. The regulations recite the language of the authorization form, 7 C.F.R. § 1421.20(a) (1989) and further state that "[t]he note and security agreement shall not be released until the loan has been satisfied in full." 7 C.F.R. § 1421.20(b).

Placing the risk of loss on plaintiffs was an essential part of the loan and security agreements. Under these agreements, plaintiffs received saleable and liquid security for their loan. This flexibility enabled plaintiffs to sell the security at a favorable time. In return for this flexibility, plaintiffs bore all risk associated with liquidating the corn. The risk borne by plaintiffs was in part consideration for the Government's permission to allow disposition of the collateral. Thus, the explicit language of both the security agreement and the authorization form place the risk of loss squarely on plaintiffs.[2]

### Implied–in–Fact Contract

■ To prove the existence of an implied-in-fact contract, plaintiffs must show mutuality of intent, an unambiguous offer, unconditional acceptance, and consideration. *Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.), *cert. denied,*

474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1984).[3] Plaintiffs therefore must show that the parties intended to bind each other and expressed those intentions clearly. *Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977).

Plaintiffs do not allege facts that arguably show an implied-in-fact contract between the parties. Plaintiffs have not demonstrated that the CCC ever offered to present the draft within a specified time or to reallocate the risk assigned by the security agreement. Plaintiffs gave no consideration for negotiation of drafts promptly or for reallocation of risk. Plaintiffs have not cited to any communication showing that the parties mutually intended the Government to cash checks other than within a reasonable time. Further, an implied-in-fact contract assigning liability to the Government for belated negotiation of drafts would contradict the risk allocation clearly contained in the parties' express agreements. This court cannot find an implied agreement holding the Government responsible. The contract's unambiguous language controls and constitutes the only source of intent. *Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 427 F.2d 722 (1970).

In sum, then, the express language of the security agreement placed the risk of loss on plaintiff for payments not received by the CCC. As a consequence, this court cannot assign to the Government the loss caused by presentment of Valley's draft at a time when Valley's account no longer had sufficient funds to cover the obligation. Plaintiffs bore the risk of this loss under the operative contractual documents.

### Applicability of the Uniform Commercial Code

■ To the extent that plaintiff argues that the ASCS unreasonably delayed

---

**2.** While the authorization form expired before the actual sale to Valley, plaintiffs understood the conditions defendant placed upon a producer who chooses to sell the collateral. In fact, plaintiffs believed the ASCS would send another authorization form to cover the period in which they actually sold the corn.

**3.** The requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs. *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 673–74, 428 F.2d 1241, 1255 (1970).

presentment, defendant has shown presentment within a reasonable time. The Uniform Commercial Code makes presentment within 30 days reasonable:

> In the case of an uncertified check which is drawn and payable within the United States ... the following are presumed to be reasonable periods within which to present for payment or to initiate bank collection:
>
>> (a) With respect to the liability of the drawer, thirty days after date or issue whichever is later....

U.C.C. § 3–503(2). This section is applicable in Colorado, the situs of the acts in this case. While the Claims Court is not bound by the provisions of the UCC, this code is persuasive authority of the reasonable time within which a drawer may present commercial drafts. *See Marine Midland Bank v. United States,* 231 Ct.Cl. 496, 506 n. 5, 687 F.2d 395, 401 n. 5 (1982), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983); *Fansteel Metallurgical Corp. v. United States,* 145 Ct.Cl. 496, 500, 172 F.Supp. 268 (1959). Defendant has also presented evidence to show that the CCC did not bear the risk of loss for negotiating Valley's draft 19 days after receipt.

### Implied–in–Law Contract

■ The Claims Court has no jurisdiction over claims based on contracts implied in law:

> The Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law.

*Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). *See also, J.C. Pitman & Sons, Inc. v. United States,* 161 Ct.Cl. 701, 317 F.2d 366 (1963).

An implied-in-law contract is a duty imposed by law "to bring about justice" without regard to mutual assent or the intentions of the parties. *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 673, 428 F.2d 1241, 1255 (quoting 17 C.J.S. *Contracts* § 4 (1963)). Promissory estoppel is another name for an implied-in-law contract claim.

■ Plaintiffs characterize defendant as a gratuitous agent who owed them a fiduciary duty to negotiate Valley's draft promptly. Plaintiffs contend that when the Government required Valley to make the check payable to the CCC, the Government became plaintiffs' agent for collection of the check.[4]

A gratuitous agent promises or manifests an intent to undertake some action with the realization that other persons therefore will refrain from taking the action themselves. The gratuitous agent becomes liable for those other persons' subsequent failure to act. Restatement (Second) Agency, § 378, comment a. Plaintiffs point out that defendant required Valley's check to be made payable to the CCC and forwarded to the ASCS. According to plaintiffs, defendant should have realized that plaintiffs would rely on the CCC to deposit the draft promptly. Plaintiffs therefore contend that the Government should assume the loss caused by belated presentment of the check.

Plaintiffs' agency claim asks this court to create an implied-in-law contract, which is beyond the Claims Court's Tucker Act jurisdiction. *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Algonac,* 428 F.2d at 1256. As previously discussed, an implied-in-law contract is not based on an agreement between the parties, but imposes a duty to prevent injustice. *Aetna Casualty & Surety Co. v. United States,* 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059–60 (1981). Gratuitous agency fits within this description. The law creates such an agency relationship to provide a remedy for those who have reasonably relied on others.

---

4. Plaintiffs in their response to defendant's cross-motion for summary judgment also depict themselves as "third-party beneficiaries of the proceeds from the draft...." Plaintiff's Response to Defendant's Cross–Motion, filed February 6, 1990, at 1. Plaintiffs' characterization fails, even assuming the existence of a contract, because they have no "direct right to compensation or to enforce that right against the promisor [defendant]." *Baudier Marine Electronics v. United States,* 6 Cl.Ct. 246, 249 (1984), *aff'd,* 765 F.2d 163 (Fed.Cir.1985).

Even if agency does not fall within the realm of implied-in-law contracts, the transaction between the parties in the case at bar does not establish a principal-agent relationship. Agency is a consensual fiduciary relationship where one person (the agent) agrees to act for and under the control of another person (the principal). Restatement (Second) Agency, § 1(1) (1958). Holders of a security interest, however, do not fall within this relationship. The Restatement explains:

> The agent's power is similar to that of the holder of a power given as security [the CCC] ... who, in certain cases, can subject the one giving the power to personal liability. Such power holders, however, are not agents because they do not have the duty to act primarily for the benefit of the giver of the power [the plaintiffs], nor are they subject to his right of control.

Restatement (Second) Agency, § 12, comment c.

In the case at bar, plaintiffs granted the Government "power" over the corn as collateral for a debt. The Government held this "power" for its own benefit, not plaintiffs' benefit. Further, the language of the security agreement clearly demonstrates that defendant was not subject to the control of plaintiffs. Thus, plaintiffs cannot claim relief by virtue of an agency relationship.

### Tort Claims: Lack of Jurisdiction

The Tucker Act confers important jurisdiction on the United States Claims Court. 28 U.S.C. § 1491(a)(1). The Claims Court may not entertain claims outside this specific jurisdictional authority. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1956); *Tree Farm Dev. Bank v. United States*, 218 Ct.Cl. 308, 316, 585 F.2d 493, 498 (1978). Thus, as the language of the Tucker Act explicitly states, the Claims Court may not decide claims that sound in tort. 28 U.S.C. § 1491(a)(1); *see also, Somali Dev. Bank v. United States*, 205 Ct.Cl. 741, 743, 508 F.2d 817, 820 (1974).

Tort claims include negligent misrepresentation, wrongful inducement, or careless performance of a duty. *Somali*, 508 F.2d at 821. Plaintiffs' characterization of their claim under contract or agency doctrines is irrelevant. This court is not bound by labels selected by the parties. *Mason v. United States*, 222 Ct.Cl. 436, 442, 615 F.2d 1343, 1345–46 (1980).

Plaintiffs contend that they incurred loss because the CCC did not negotiate Valley's draft promptly. Specifically, if the CCC had presented the check to a bank within a reasonable period of time, Valley's account would have contained sufficient funds. The CCC in turn would not have had to draw on other capital of plaintiffs to satisfy their indebtedness. To the extent that plaintiffs allege careless performance of a duty which does not exist under contract, their complaint sounds in tort and therefore is not within the jurisdiction of this court.

### CONCLUSION

The parties did not enter into an express or implied-in-fact contract requiring the Government to negotiate promptly drafts received to satisfy plaintiffs' indebtedness. The parties' agreements assigned risk to plaintiffs. Further, this court lacks jurisdiction over plaintiffs' contention that the CCC acted as an agent in receiving Valley's draft and breached a fiduciary duty. This contention asks this court to grant relief under an implied-in-law contract or tort law.

This court denies plaintiffs' motion for summary judgment and grants defendant's cross-motion for summary judgment. The court directs the Clerk to dismiss plaintiffs' complaint.

No costs.