**ASSOCIATION OF FLIGHT ATTENDANTS, AFL–CIO, Plaintiff,**

v.

**UNITED AIRLINES, Defendant.**

**No. CV–92–2919 (CPS).**

United States District Court, E.D. New York.

July 16, 1992.

Cohen Weiss & Simon, New York City, for plaintiff.

O'Melveny & Myers, New York City, for defendant.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

This is an action brought by plaintiff, the Association of Flight Attendants ("AFA"), pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, seeking an injunction to prevent defendant, United Airlines ("United"), from violating the seniority provisions of the collective bargaining agreement ("CBA") between the parties in staffing United's new base of operations in Paris, France.

The matter is currently before the Court on a motion for a preliminary injunction to halt, pending trial, United's implementation of its award of positions to fill flight attendant vacancies at the airline's Paris domicile in derogation of the CBA's seniority provisions. United proposes to fill those positions, unless otherwise restrained from doing so, by having those awarded jobs report for work in Paris on July 20, 1992, and begin service out of Paris on August 1.[1]

Having considered the affidavits and exhibits as well as the legal and factual arguments presented in the papers in support of and in opposition to the motion at a hearing held on July 7, 1992,[2] I determine that a preliminary injunction in the form filed contemporaneously with this opinion is appropriate. What follows sets forth the findings of fact and conclusions of law on which this determination is based as required by Rule 65(a) of the Federal Rules of Civil Procedure.

AFA is a labor union that serves as the certified and exclusive collective bargaining agent for United's more than 17,000 flight attendants. United is a major airline servicing many domestic cities as well as South America, Europe, and Asia.

The union and the company have entered into a CBA that regulates, among other terms and conditions of employment, the method of assignment of various scheduled routes and locations of employment. The current CBA was entered into on December 3, 1991.

The locations where flight attendants are based are known as "domiciles." United currently has thirteen domiciles, all of which are in the United States with the exception of one in London, England. Flights that do not leave from one of those domiciles are nevertheless staffed by attendants based at one of them.

Under the collective bargaining agreement currently in effect, flight attendants wishing to change domiciles "bid" for their desired location. These bids are to be granted on the basis of seniority. *See* Agreement §§ 12(B)(2)(B); 17(A)(3)(a); 22(a)(2). The Agreement provides in this regard:

> Seniority shall govern all flight attendants in connection with their retention in case of furlough due to reduction in force, re-employment after furlough, preference in assignment of domicile as vacancies occur, and preference of assignment to monthly schedules provided that the flight attendant is sufficiently qualified for the conduct of the operation involved.

Agreement § 17(A)(3)(a).

Special rules apply to bidding for international routes. In general, these routes, called "international operations," Agreement § 12(A)(1), are also "available for system bid." Agreement § 12(B)(2)(a). The CBA provides:

---

1. The union has also filed pursuant to the CBA a grievance over the seniority issue it raises in this litigation. United conducted a hearing on that grievance on June 11, 1992. United represents that it plans to deny the relief requested in the grievance.

2. On July 7, 1992, both sides declined the opportunity to present testimony at an evidentiary hearing to resolve the disputed issues of fact presented by the papers in apparent recognition of the fact that, even if those disputes were to be resolved against them at this stage of the proceeding, testimony and the demeanor evidence and cross-examination which goes along with it would be of little assistance to the finder of fact in reaching the correct result. Where a party against whom an injunction is sought is "demonstrably 'content to rest' on affidavits submitted to the court," no evidentiary hearing is necessary. *Fengler v. Numismatic Americana, Inc.,* 832 F.2d 745, 748 (2d Cir.1987); *see also Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir.1989). As a consequence, the undersigned has resolved the factual disputes presented by the papers based on inferences drawn from the largely undisputed circumstantial evidence. In this posture, of course, any reviewing court need pay less deference to this Court's factual findings than would be the case if they were based on assessments of witness demeanor, simply because it is easier for a reviewing court to determine if the district court has committed "clear error" in performing its responsibility as primary finder of fact. *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Groups, Inc.,* 886 F.2d 490, 493 (2d Cir. 1989) (quoting *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 54 (2d Cir.1985)).

Bids for the International Operation shall be posted at all domicile locations for a minimum of thirty (30) days. Bids shall state the number of assignments available; the qualifications necessary if applicable; the date the assignment is to begin; place where the bids are to be sent; and the last date on which they will be received. All assignments shall be awarded in accordance with System Seniority. Bids for the language qualified position shall be awarded on the basis of System Seniority as outlined in Paragraph C below.

Agreement § 12(B)(2)(b).

As indicated in the provision just quoted, the CBA treats "language qualified" flight attendants differently from all other attendants. Agreement § 12(C)(7)(a). Thus, language-qualified positions must be filled in seniority order from among the ranks of language-qualified flight attendants. *Id.* The agreement, however, strictly limits the number of foreign language positions the company may designate on each flight, permitting two such spots on wide-bodied aircraft and one such spot on narrow-bodied aircraft. Agreement § 12(C)(7)(f).

United has expressed its dissatisfaction with these numerical limits on the number of language-qualified flight attendants and has attempted in collective bargaining to increase the number of language-qualified attendants serving on international routes.

According to both custom and the CBA, if United cannot meet its staffing demands for a particular vacancy because of a shortage of bids for the position from flight attendants on its seniority list, then it can hire off the street to fill the vacancy.

The CBA contains two other contract provisions referred to by the parties. CBA § 12(U)(6)(b) states:

Prior to announcing the opening of an International domicile outside the United States, the Company will meet with the [union] president or designee to review the terms and conditions for establishing the domicile. The recommendations of the Union shall be considered by the Company prior to establishing the domicile.

The CBA also contains a traditional savings clause which states in relevant part:

Should any part or provision of this Agreement be rendered invalid by reason of any existing or subsequently enacted legislation, such invalidation of any part or provision of this Agreement shall not invalidate the remaining portions thereof, and they shall remain in full force and effect.

United has a relatively short history in international service. It first went abroad in 1983 when it began flying to Asia. In 1986 it purchased Pan Am's Pacific routes; in 1990 it began flying to Europe; and in 1992 it acquired Pan Am's South American routes.

At some time not specified in the papers within the last two years, United began flying to and from Paris, France. Because it does not have a domicile in Paris, it has used flight crews from other domiciles to staff those flights. This apparently costs the airline more money than it would to locate a domicile there, because United must pay to transport attendants to staff Paris flights and must pay for accommodations and other incidental expenses incurred by attendants flying the Paris route. Accordingly, at some unspecified time in early 1992 United decided to add a Parisian domicile to its operations. The relocation of the domicile will not in itself create an increase in business; rather, it represents a diversion of it. United is not adding new international routes but simply reassigning routes it currently flies to the Paris domicile.

United first informed the union of its intention to open a Paris domicile on February 14, 1992, by sending a brief letter to Diane Tucker, the AFA's Master Executive Council President. The CBA obligates United to provide such notice. Agreement § 22(D)(1). That notice stated, *inter alia,* that opening of the domicile was "contingent on obtaining all necessary governmental approvals" and that the company was "currently evaluating ... staffing levels." While the union president responded to the airline's invitation, mandated by the CBA, that she meet with the company to discuss

the matter, the airline put off any such meeting for two months, until April 13, 1992. Thereafter, United determined that it would need some 275 attendants to fill all vacant positions, 50 of whom were to be language qualified.

During the period of time from February until April, United, without advising the union or flight attendants of what it was doing, entered into negotiations with unnamed French government officials on the subject of obtaining work permits or visas for the flight attendants who it anticipated would bid for the vacancies. Both sides present only sparse, second-hand accounts of what occurred during these negotiations—a fact that is more understandable from the standpoint of the union, which did not even know they were going on, than it is from the standpoint of the airline whose representatives were in direct contact with the relevant government officials. Unidentified French counsel for United is quoted by United as saying that the French were reluctant to grant any visas and agreed to seventy-five for United States citizens only after "extended discussions" not otherwise described. No information is provided by United as to who first proposed the figure of seventy-five, what arguments were employed on both sides, how much time was devoted to the exercise, or who participated in it.

The union president for her part states that, in direct conversations with a French government official whom she identifies by name, she was told that United, not the French government, was the source of the seventy-five visa figure. Not only were the union and the flight attendants not advised of the conduct of these negotiations, but United has, since that time, refused to disclose information concerning the negotiations to the union.

The sizeable gap between the projected 275 proposed vacancies and the 75 visas was first disclosed by United to the union at a meeting between Union President Tucker and United on April 13, 1992. Here again, a dispute exists over what representations, if any, the airline made regarding whether it or the individual attendants would assume responsibility for arranging additional visas. Given all of the circumstances, I find at this stage that it is probable that United led the union to believe that it would, as it had earlier in London, undertake the responsibility of obtaining additional visas.

Three days later, on April 16, United notified the entire union membership of the new domicile by posting a notice, which the parties call the "April notice," on company bulletin boards at all thirteen domiciles in the United States and London. The CBA requires such notification. Agreement § 12(B). According to the notice, bids were due at the earliest date permissible under the CBA—that is, within thirty days, by 8:00 a.m. CDT on May 18th, with awards to be announced the following day. The notice indicated the opening of "225 flight attendant vacancies, and 50 flight attendant French language vacancies."

The notice did not alert union members that many of them would have to seek visas on their own if they wanted to relocate to Paris. In fact, no such alert was given until the very eve of the award. To the contrary, a section of the April 16 notice entitled "Immigration" informed attendants that the French government had provided United with "documents which must be submitted by U.S. and Canadian citizen flight attendants.... These documents will be forwarded to you once your transfer has been awarded." Nowhere did the notice inform attendants that the French government had agreed to issue only seventy-five visas, and those only to United States citizens. In addition, the April notice included a section on "qualifications and training," which itemized certain types of equipment and safety procedures but nowhere mentioned immigration matters.

On April 28, some twenty days before bids were due, the company began mailing an information booklet to bidders.[3] That document contained a section labelled "Im-

---

**3.** Any attendants who placed bids on file after this date but prior to the close of bidding did not receive the booklet until after their bids had been recorded.

migration," which included the statement that—

> United has obtained agreement from the French government to grant entry to France (for employment purposes) for a limited number of U.S. citizens under a 'secondment' status.... Individual flight attendants are free to utilize their own efforts and resources to obtain immigration approval for entry into and authority to work in France separate from the secondment status opportunity negotiated by United. All non-French, non-EEC citizens who submit a bid to France must demonstrate proof of immigration approval to enter and work in France in advance of being assigned an effective date for their transfer.

Finally, on May 7, eleven days before the close of bidding, the company posted on company bulletin boards a notice informing employees that it had received pre-approved secondment status for "75 U.S. citizens." It further explained that attendants having less seniority than the 75 most-senior U.S. attendants could only "accept a transfer" if they were EEC citizens or could otherwise arrange a visa on their own. The notice further informed attendants that, if they failed to provide "documentation" of immigration approval to work in France by the May 18 deadline, they would be deemed to have "refus[ed]" the transfer.

A total of 467 attendants applied for transfer awards for the general vacancies. Nineteen attendants applied for transfer awards to fill the language-qualified vacancies, eleven of whom had also applied for the general vacancies. Since many more attendants applied for general vacancies than there were spots available, the CBA's seniority provisions were triggered. Since fewer attendants applied for the language-qualified positions than there were spots

available, the seniority provisions applicable to language-qualified attendants would not affect the award of those positions unless they were to be filled by new hires.

At an unspecified time after receiving bids but before commencement of this suit, United further reduced opportunities for working in Paris for non-language-qualified flight attendants. Unlike the original proposal, which made available 225 general positions and 50 language-qualified positions, United's new plan decreased to 135 the available general positions and increased to 60 the language-qualified ones.

Not surprisingly, given United's unilateral dealings with the French authorities and the short time and lack of clear advice to flight attendants concerning the need to secure visas on their own, none of the 467 attendants who applied for awards for general vacancies obtained or supplied the required visas when asked for them. United then transferred the seventy-five most senior flight attendants with United States citizenship (each of whom received one of the pre-approved visas), two language-qualified flight attendants who were also EEC citizens,[4] and thirty-five other incumbents, only seven of whom are among the seventy-five most senior attendants but all of whom were citizens of EEC nations. United did not transfer any flight attendants of Canadian citizenship, although some were among the seventy-five most senior attendants. United filled the balance of the positions by hiring new employees off the street. These new employees were all citizens of EEC member nations and presumably fulfilled United's goal of expanding the number of foreign language speaking flight attendants.

Not all attendants accepted transfers. Seventy-one expressly refused the awards, as the CBA allows them to do. The airline

---

**4.** Of the nineteen applicants for these positions, one was not considered language qualified as the CBA defines that term, and eleven others had also bid for the general vacancies. Under the CBA, United must first fill the general positions and only then fill the language-qualified ones. Thus, these eleven were not given language-qualified positions. Five of them were, however, awarded transfer into general vacan-

cies because they were citizens of EEC countries. This means not only that five otherwise qualified attendants who properly bid for the language-qualified positions were shut out because of their citizenship or lack of visas but also that United has transferred five more language-qualified attendants than at first appears from the record.

also deemed 173 attendants as having refused awards because of their failure to respond timely to telephone calls placed to notify them of the award.[5]

Only twice before has United attempted to set up foreign bases for flight attendants, and both those instances reflect conduct significantly different from that which United followed in the circumstances which led to the present dispute. In the first of those instances, the company timely met with the union to work out potential difficulties unique to the foreign environment. Thus, in 1985, after acquiring certain Asian routes, United sought to staff flights with Asian attendants who were not AFA members. The company and the union met and negotiated the issue. The two sides eventually concluded a detailed side-agreement that allowed those non-AFA employees to service only intra-Asian flights but with conditions that they not be considered flight attendants entitled to seniority advancement, that they wear different uniforms, that no AFA member could be furloughed while they were employed, and that a limit be set on the number of such "foreign nationals" that could staff each flight.

In the second instance, United acted as it did in this case unilaterally but ensured that attendants did not encounter the sort of immigration problems they now face. When the company moved to establish a London domicile in 1991, United arranged with the British government for pre-approval of some 600 work visas to cover 525 anticipated vacancies. Only 237 incumbent attendants requested transfer to the London domicile, and of these, only 155 eventually accepted transfer.[6]

AFA claims that United's decision to appoint some less senior attendants and to hire other citizens of EEC countries violates the seniority provisions of the collective bargaining agreement. It accuses United of trying to circumvent the bargained-for limits on the number of language-qualified attendants.

United responds that it abided by the CBA in that it made offers to all attendants who applied. United argues that its refusal actually to transfer more attendants in order of seniority is attributable solely to the fact that the applicants did not have the work visas or EEC citizenship that French law requires. For this reason, contends United, the workers denied transfer to Paris were not "qualified for the conduct of the operation involved." *See* Agreement § 17(A)(3)(a).

## DISCUSSION

■ A party seeking a preliminary injunction "must establish (1) irreparable injury and (2) a likelihood of success on the merits *or* a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in the moving party's favor." *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131 (2d Cir.1992). Although under certain conditions the RLA allows courts to grant a permanent injunction without a showing of irreparable injury, *Consolidated Rail Corp. v. Railway Labor Execs. Assoc. ("Conrail")*, 491 U.S. 299, 303, 109 S.Ct. 2477, 2480, 105 L.Ed.2d

---

5. United contends that "a number" of bids may have been filed in bad faith, comparing a 48% rejection rate for Paris with a 34% rejection rate for London and citing conversations with "several" flight attendants. Even assuming United's extrapolations from these figures are correct, there remained a substantial number of bona fide bidders who were entitled to the award but did not get it because of a shortfall in the number of visas. Should it appear hereafter that any visa was unnecessarily obtained because the bidder was not acting in good faith and turned down the award after the visa was obtained, United may seek to recover on the bond securing it against damages caused by the union's wrongful conduct.

6. It is perhaps of note in connection with the provisional relief here awarded, *see, infra,* that, at one point during litigation in Great Britain over the staffing of the London base, United felt it appropriate to educate the British court about American labor law in order to persuade the court that it should not insist on conditions which would trigger a dispute between the airline and its employees. There is no evidence that United made any representations here to the French authorities concerning the effect of a limitation on visas on the company's relations with the union. Indeed, as noted above, the airline does not disclose at all the substantive nature of the efforts made by it to secure visas for senior flight attendants.

250 (1989), where a party moves for a preliminary injunction the traditional rules apply. *Local 553, Transport Workers Union of America v. Eastern Air Lines,* 695 F.2d 668, 677 (2d Cir.1982). The relevant questions posed by such an application in this case are whether there will be irreparable injury in the absence of preliminary relief and whether movant is likely to succeed on the merits by demonstrating that the dispute is "major" and, therefore, requires the permanent injunction provided for in the RLA.[7]

I address first the question whether the union's dispute with United is "major" or "minor." *See Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 722–27, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945). Major disputes relate to RLA's admonition that no carrier "shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements." 45 U.S.C. § 152 Seventh. *See also* 45 U.S.C. § 156. Minor disputes derive from the RLA's mechanism for resolving "grievances or ... the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 152 Sixth & 153 First (*l*). The Supreme Court recently summarized the difference: major disputes seek "to create" contractual rights; minor disputes seek "to enforce" them. *Conrail,* 491 U.S. at 302, 109 S.Ct. at 2480.

This distinction matters because the characterization of the dispute determines how it will be resolved. To resolve a major dispute, "the RLA requires the parties to undergo a lengthy process of bargaining and mediation.... Until they have exhausted those procedures, the parties are obligated to maintain the status quo"; once those procedures are exhausted, the parties may resort to economic self-help. *Conrail,* 491 U.S. at 302, 109 S.Ct. at 2480. In contrast, a minor dispute demands "conference and compulsory arbitration procedures" before a board established in the collective bargaining agreement, which has exclusive jurisdiction over these disputes.

*Id.* at 303–04, 109 S.Ct. at 2477–78. The company is under no statutory obligation to maintain the status quo during the pendency of disputes falling into this latter category. *Id.* at 304, 109 S.Ct. at 2481.

■ Courts have frequently noted practical difficulties in drawing this distinction between disputes. *See, e.g., National Railway Labor Conf. v. International Assoc. of Machinists and Aerospace Workers,* 830 F.2d 741, 748 (7th Cir.1987). Some guidance may be drawn from *Burley,* which explained:

[Major disputes] relate[ ] to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to the assertion of rights claimed to have vested in the past.

[Minor disputes], however, contemplate[ ] the existence of a collective bargaining agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or an omitted case.... [T]he claim is to rights accrued, not merely to have new ones created for the future.

*Burley,* 325 U.S. at 723, 65 S.Ct. at 1290. Thus, where a dispute involves conduct contrary to the "express provisions" of the agreement, it is major dispute. *CSX Transport., Inc. v. United Transp. Union,* 879 F.2d 990, 996 (2d Cir.1989) (citation omitted), *cert. denied,* 493 U.S. 1020, 110 S.Ct. 720, 107 L.Ed.2d 740 (1990). The Supreme Court has recently clarified that—

the line drawn by *Burley* looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. The distinguishing

---

**7.** The RLA applies to the airline industry by virtue of 45 U.S.C. §§ 181 *et seq.*

feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement.

*Conrail,* 491 U.S. at 305, 109 S.Ct. at 2481.

As defendant points out, in drawing the distinction solely on the basis of whether the issue is one of contract interpretation as opposed to formation, *Conrail* does not permit consideration of the "pragmatic" consequences of a dispute, a factor that the Second Circuit has considered in the past. *See Local 553,* 695 F.2d at 673–74. *Conrail* rejected a "case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self help." *Conrail,* 491 U.S. at 305, 109 S.Ct. at 2481. In support of this conclusion *Conrail* cited a lengthy footnote from the Seventh Circuit's opinion in *National Railway Labor Conference,* 830 F.2d at 747 n. 5, which expressly considered and rejected the "pragmatic" approach approved in *Local 553.*

Thus, the question here is, irrespective of the consequences likely to follow from United's transfer and hiring decisions, does this dispute admit of conclusive resolution by interpreting the existing agreement?

■ In answering this question, the Court must bear in mind the "relatively light burden" imposed on United in demonstrating that the dispute is minor and that arbitration is appropriate. *See Conrail,* 491 U.S. at 307, 109 S.Ct. at 2482 (citation omitted). This standard requires the Court to deem the dispute minor if the action is "arguably justified" by the terms of the parties' collective bargaining agreement. An employer's claim is arguably justified by the terms of a collective bargaining agreement if it is "neither obviously insubstantial or frivolous, nor made in bad faith." *Id.* at 310, 109 S.Ct. at 2484.

■ The fact that a party can point to one of several terms in a collective bargaining agreement as asserted justification for its position does not end the inquiry. "In a situation in which the party asserting a contractual basis for its claim is 'insincere' in so doing ... the result of honoring that party's characterization would be to undercut" the RLA's prohibitions "against uni-

lateral imposition of new contractual terms.... In such circumstances, protection of the proper functioning of the statutory scheme requires the court to substitute its characterization for that of the claimant." *Id.* at 306, 109 S.Ct. at 2482. *See also Rutland Railway Corp. v. Brotherhood of Locomotive Engineers,* 307 F.2d 21, 33 (2d Cir.1962), *cert. denied,* 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963). Just as a party may not rely on an insubstantial or frivolous interpretation of a contract term, it also may not depend upon purposeful manipulation of an otherwise valid contract term in order to evade its RLA obligations. *See Burlington Northern R.R. Co. v. United Transp. Union,* 862 F.2d 1266, 1273 (7th Cir.1988).

Several of United's arguments are frivolous or insubstantial. Thus, United argues that French immigration law requires it to hire in derogation of the seniority provisions of the CBA or, alternatively, that the seniority provisions have been rendered "invalid" by French law and, thus, are *pro tanto* ineffective under the CBA's "savings clause" set forth in section 32 of the agreement. Quite apart from the common sense response that French immigration law does no such thing, this Court has already considered and rejected the sophistry of such an argument.

■ In *Local 553, Transport Workers Union v. Eastern Air Lines,* 544 F.Supp. 1315 (E.D.N.Y.), *aff'd as mod.,* 695 F.2d 668 (2d Cir.1982), an airline acquired another carrier's foreign routes that had been serviced by foreign workers. The workers' names did not appear on a seniority list, and the collective bargaining agreement required the airline to draw all staff from that seniority list. The airline argued that it could nevertheless hire these foreign workers because the foreign nations included in the new routes obligated it to do so. Ten years later it remains true that "a carrier should not be able to avoid its RLA obligations based upon foreign law where it has voluntarily put itself in a situation where it knew those laws would be applicable." *Id.* at 1336. Like the common law

doctrine of coming to a nuisance, this rule prevents the instigator of trouble from calling itself the victim. *See also Telegraphers v. Chicago & North Western Railway Co.*, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960) (where railroad prevailed on state agency to change rules and thereby reduced number of stations, railroad could not point to those state rules as a reason it need not bargain with the union over station closings).

Recognizing the force of *Local 553*, United attempts to distinguish it. It first contends that *Conrail* overruled *Local 553*. However, as already discussed, *Conrail* did so only to the limited extent that it rejected evaluation of the pragmatic consequences of the dispute in classifying the dispute, a factor which the district court in *Local 553* did not include in its analysis in any event. *Local 553*, 695 F.2d at 676 n. 8. United next makes the spurious argument that *Local 553* concerned a conflict between foreign law and the domestic law in the form of the RLA, whereas the present case concerns a conflict between foreign law and the collective bargaining agreement. The agreement, of course, exists only by virtue of domestic law, and the obligation it imposes is to bargain collectively in order to head off or resolve disputes. *See* 45 U.S.C. § 152, First and Fourth. Once the agreement is established, unilateral alterations of its terms by the carrier constitutes a violation not only of the agreement, but also of the RLA itself. *See* 45 U.S.C. § 152, Seventh.

Equally insubstantial is United's argument that it is entitled to ignore the seniority provisions of the contract by virtue of its retained management prerogatives. In making this argument, United seeks to avail itself of recent developments in the case law according increasing deference to "management prerogatives" in making fundamental business decisions without concern for collective bargaining agreements. *See Pittsburgh & Lake Erie R.R. Co. v. RLEA*, 491 U.S. 490, 509, 109 S.Ct. 2584, 2596, 105 L.Ed.2d 415 (1989). In *Pittsburgh & Lake Erie*, the Supreme Court held that a railroad's decision to sell all its trackage rights and leave the business was a management prerogative which did not require bargaining with the union. In the wake of *Pittsburgh & Lake Erie*, even decisions of less moment than a decision to wind up the business, including the sale of some but not all trackage rights, have been considered business prerogatives. *See CSX Transp., Inc. v. United Transp. Workers*, 950 F.2d 872, 878–79 (2d Cir.1991); *Chicago & North Western v. Railway Labor Exec.*, 908 F.2d 144, 152 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991).

■ This line of cases does not apply here because the unilateral decision to relocate employees is not a business prerogative but rather a working condition that may provoke a major dispute. *See Detroit & Toledo Shore Line Railroad Co. v. United Transp. Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); *Telegraphers, supra*. The Second Circuit has identified a "fundamental distinction" between these two cases on the one hand and *Pittsburgh & Lake Erie* on the other: *"Shore Line* and *Telegraphers* involved railroad decisions that were explicitly about job conditions—where best to place workers along a railroad line ... and whether to work at central or dispersed locations.... The decision to sell a track line is fundamentally different. It is not primarily about labor but about capital, or business assets." *CSX Transp.*, 950 F.2d at 879. The decision at issue in this case, of course, concerns not whether to fly to France, but whether to locate workers there. Thus the decision, while of course involving capital, is fundamentally about labor.

Other claimed justifications for what United has done with respect to the award of bids for the Paris domicile would, perhaps, be substantial and non-frivolous if what United has in fact done is what United contends it has done. United contends that it has done nothing more than treat the obtaining of French work permits or visas as one of the qualifications of being awarded a bid for a foreign domicile and, thus, declined to award vacant positions in the Paris domicile to the flight attendant seeking the position with the most seniority

where the flight attendant does not have a work permit or visa required by the French government. If this were in fact all that United has done, it is, at the least, arguable that its position is a justified interpretation of the contract's provisions with respect to qualifications, particularly in the light of the prior experience of the parties with the opening of an earlier domicile in England and subsequent negotiations between the parties over the CBA's terms.

Two separate sections of the agreement that are relevant here mention qualifications: section 17(A)(3), already quoted, and section 12, relating to "international operations."

Section 12(C) is entitled "qualifications" and contains a list of seven items. Of note are the following:

1. Flight attendants who successfully bid the International Operation shall be required to obtain and maintain a current passport, all required immunizations and over water qualifications. In the event a flight attendant's passport is lost or stolen, the Company, at the flight attendant's request, will provide the necessary documentation to expedite obtaining a replacement.

\* \* \* \* \* \*

3. Visas—Local management shall monitor International Operation trips and arrange visas as required. An International Operation with frequent trips to particular visa-requiring countries may specify a required visa qualification at their location. Non–U.S. citizens in the International Operation may have special visa needs and may be required to maintain certain visas.

\* \* \* \* \* \*

6. The Company shall bear the cost of any necessary passports, visas or immunizations. . . .

The other items on the list deal with partial qualifications, immunizations, equipment qualifications, and foreign language qualifications.

The foregoing provisions raise a serious question as to whether obtaining visas or work permits is a qualification for working at a foreign domicile. No provision deals with the peculiar difficulties presented by the establishment of a foreign domicile, as distinct from an "international operation." The way the provisions have been drafted—particularly the language about visas being required for "frequent trips *to*" certain nations—suggests that at the time of drafting the CBA the parties contemplated that United would fly its foreign routes from domestically based domiciles. This makes sense given United's explanation that this section was added to the agreement in 1988 when United acquired certain Pan Am routes, which it staffed with domestically based flight attendants. Moreover, United itself concedes that this language was designed to respond to attendants traveling to foreign locations, not based there.

Nevertheless, evidence of the parties' "practice, usage and custom' is of significance in interpreting their agreement." *Conrail*, 491 U.S. at 311, 109 S.Ct. at 2485. "To gain a complete picture of the relationship between the parties, and thus of the scope of the dispute to be settled by the provisions of the RLA, courts must consider the express terms of any agreements and well established practices that have developed through the past course of dealings." *Air line Pilots Assoc. v. Eastern Air Lines*, 863 F.2d 891, 896 (D.C.Cir.1988), *cert. denied*, —— U.S. ——, 112 S.Ct. 37, —— L.Ed.2d —— (1991).

Indeed, these past practices can go further than simply informing the interpretation of the written terms; they can ripen into contract terms themselves. "The collective bargaining agreement need not explicitly address the dispute in issue because a collective bargaining agreement embodies terms not necessarily express but nonetheless included by implication. . . . The past practice in effect becomes a part of the implied-in-fact contract between the carrier and the union, and such disputes amount to an interpretation of the contract." *Burlington*, 862 F.2d at 1273.

United points to the only other foreign domicile it has established—in London during 1991, prior to the execution of the

present agreement—as evidence of custom. United claims that it faced immigration difficulties there which put the AFA on notice that creation of such foreign domiciles would implicate the host nation's immigration law. The Union disclaims knowledge of these immigration problems and argues that an implicit contract term cannot be inferred from custom and practice if it had not "occurred for a sufficient period of time with the knowledge and acquiescence of the employees." *Shore Line*, 396 U.S. at 154, 90 S.Ct. at 301. However, it is hard to see how the union could have missed the fact that visas and work permits were required of a substantial number of employees in order for them to work in London.

Thus, neither the terms of the contract nor the past history of dealings between the parties points so clearly in one direction that United's justifications for what it says it has done can be rejected as frivolous or insubstantial. I conclude, nevertheless, that it is likely that plaintiff will succeed in persuading the finder of fact at a trial that what is at issue here is a major dispute. I reach this conclusion because I find at this stage of the proceedings that it is likely that plaintiff will succeed in persuading the finder of fact that what United is in fact engaged in is not, as it describes it, a straightforward attempt to apply the seniority clause of the CBA with the proviso relating to qualifications but that it is, instead, engaged in an effort to manipulate the process of obtaining visas and work permits in order to avoid compliance with the CBA's seniority provisions.

The facts of this case at this preliminary stage demonstrate that this dispute is "more properly framed as an attempt … to alter unilaterally" the normal requirement of seniority appointment on all flights by "the vehicle" of the visa requirement, *Burlington*, 862 F.2d at 1274, and that United's argument based on the term "qualifications" is, thus, in all likelihood, made in bad faith. *See O'Donnell v. Wien Air, Alaska*, 551 F.2d 1141, 1147 (9th Cir. 1977) ("The provisions of the Railway Labor Act may not be avoided merely through device of unilateral action which the actor purposefully intends shall not become a part of the agreement.") (quoting *Switchmen's Union v. Southern Pacific Co.*, 398 F.2d 443, 447 (9th Cir.1968)); *International Bhd. of Elec. Workers v. Washington Terminal Co.*, 473 F.2d 1156 at 1172 (D.C.Cir.1972), *cert. denied*, 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed.2d 195 (1973) (same). I make this finding that United's purported contractual justification is "insincere," *Conrail*, 491 U.S. at 306, 109 S.Ct. at 2482, based on all the circumstantial evidence on the point including the evidence of the way United has dealt with the visa/work-permit issue in the past at the other domiciles it has sought to establish, the distinctly different way it had dealt with the issue here, the manner in which it dealt with this issue with the French authorities, the less-than-candid fashion in which it has handled the issue with its employees, its reticence in this Court, and United's distinct motivation to evade the seniority provisions of the CBA in order to hire more foreign language-qualified personnel.

As already noted in dealing with the issue of work permits and visas in the past, United has either worked together with the union in reaching a mutually satisfactory solution (as in Asia) or has accomplished a result unilaterally which satisfied its own and its flight attendants' objectives (as in London where it obtained more work permits than needed to satisfy all applicants for the job). In the case of Paris, it has followed its practice in London of proceeding unilaterally to negotiate with the local authorities on its own behalf and on behalf of its flight attendants. In Paris, however, it has come up substantially short of the number of visas necessary to accommodate all of the flight attendants bidding for the job in order of seniority. While United seeks to portray this as the result of French intransigence, it supplies little persuasive evidence to support this; the union disputes it; and the airline fails to deal with the obvious inferences to be drawn from the fact that the end result of its unilateral dealings serves its own interest in departing from the seniority list in order to hire more multi-lingual EEC natives and disserves the interests of its employees.

*See Armstrong v. Republic Realty Mtg. Corp.*, 631 F.2d 1344, 1348–49 (8th Cir. 1980); *Hubbs v. United States*, 20 Cl.Ct. 423, 427 (1990), *aff'd*, 925 F.2d 1480 (Fed. Cir.1991).

Other evidence as well supports a finding that United is using the qualifications issue to mask its disregard for the seniority list, including the company's lack of disclosure to the union and its members of what it was about until it was too late for the union or its members to do much to change the result, the unclear if not misleading communications to union members concerning who was responsible for securing visas, and the apparent effort to create a paper record of assisting flight attendants to obtain work permits at a time and under such circumstances as to make the task impossible. Based on all of the circumstances, I conclude at this point that the company is unlikely to prevail on the merits of this issue.

United does not even argue that it was entitled under the CBA to interfere with the employees' ability to become qualified in order to avoid the impact of the seniority clause. If it made such an argument, it would plainly be frivolous.[8] *See Burlington*, 862 F.2d at 1273. Instead, it argues that that is not what it did. Because I find at this stage of the proceedings that plaintiff will likely succeed on the merits in persuading a finder of fact that this, indeed, is what it did, the first prong of the test for issuance of a preliminary injunction is met.

This leaves the issue of irreparable harm. Defendant argues that there will be no irreparable harm because it can identify all attendants who wanted to transfer but were not allowed to do so with reasonable certainty, and thus make them whole, and that only a few attendants have been shut out of this new domicile.

However, both sides recognize that bidding for schedules is itself a tightly interconnected system based on seniority, where a more senior attendant's preferred schedule has consequences that cascade down throughout the rest of the assignments. While it might be possible to determine the identities of attendants who wanted to transfer to Paris but have not been permitted to do so as a result of the company's conduct, that does not suffice. If those attendants were relocated to Paris, then the routes—both domestic and international—assigned to the domiciles that they left in favor of Paris would be opened up to less senior bidders. How these people would bid on those opportunities cannot be determined if those opportunities are not presented. While, as United points out, the Second Circuit in *Local 553* rejected the argument that inconvenience constitutes irreparable harm, that Court also noted that as a practical matter such intangibles as convenience necessarily shape monthly schedules under the bidding system in a way that cannot be calculated.

There remains to be considered what form preliminary relief should take and upon what conditions it should be awarded. With respect to the form of relief, it seems apparent that simply directing United to afford senior flight attendants, otherwise entitled to an award of the position, a full and fair opportunity to obtain visas will in all likelihood not be adequate. By agreeing unilaterally with French authorities that 75 visas would serve its purposes, United has effectively compromised the ability of flight attendants proceeding on their own to obtain additional visas. Colloquially speaking, United has "poisoned the well." Accordingly, United must convey to the French authorities in no uncertain terms, as it did in analogous circumstances in Great Britain, that its collective bargaining agreement with its employees and U.S. law obligate it to seek visas for all employees on its seniority list who bid for vacancies at the Paris domicile and are entitled to the award because of their place on the

---

**8.** Not only does such interference with employees' efforts to become qualified flatly conflict with the express language of the CBA requiring United to offer all employees "an opportunity to transfer and fill the vacancy," Agreement § 22(A)(2), but it is counter to the numerous explicit provisions in the CBA and instances of past practice in which the airline has undertaken to assist flight attendants in becoming qualified. *See* Agreement § 15(D) and (G).

company's seniority list. The only effective way of conveying this message to the French government at this juncture is to bar the airline from filling any vacancies unless work permits are obtained for all flight attendants seeking the position and otherwise entitled to it by reason of their seniority.

An early trial on the merits seems appropriate. If an early trial cannot be held and if United's good-faith efforts, taken together with the union, to secure visas for all, do not succeed over time in obtaining relief from the French authorities, the parties may well agree between themselves to fill the vacancies by hiring some number of citizens from EEC countries who do not require visas and who are not entitled to the award based on seniority. If such conditions as outlined above are met and the parties cannot agree on a modification of the preliminary injunction, United may return to Court to seek modification of the preliminary injunction.

With respect to the conditions on the grant of the preliminary injunction, defendant has informed the Court that it will incur costs of $100,000 per month if the domicile does not open on August 1—these costs representing the price of staffing these flights in the same method currently used by the airline. While it cannot be determined in advance how long the opening of the domicile will be delayed by the requirement that the parties return to the French authorities to obtain additional visas, there is no reason to think it will take all summer.

Since it may be inferred that both sides anticipate some cost savings from the establishment of the domicile, the Court will fix $50,000 as the amount of the bond which the union must post as condition for the effectiveness of the injunction to secure United against costs and damages incurred or suffered in the event that it is found to have been wrongfully enjoined.

For the foregoing reasons, United is preliminarily enjoined pending further order of this Court or the trial of this matter from filling flight attendant vacancies at its Paris, France domicile unless and until visas are obtained from the French government for all flight attendants requiring them and otherwise entitled to fill such vacancies by reason of their seniority.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.